Filed 6/25/12

# IN THE SUPREME COURT OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | ) |
| | ) |
| Plaintiff and Respondent, | ) |
| | ) S085578 |
| v. | ) |
| | ) |
| CHARLES McDOWELL, JR., | ) |
| | ) Los Angeles County |
| Defendant and Appellant. | ) Super. Ct. No. A379326 |
| _____ | ) |

Capital defendant Charles McDowell, Jr., comes before this court for the second time. In 1984, a jury convicted defendant of first degree murder (Pen. Code, § 187),[1] attempted murder (§§ 187, 664), attempted rape (§§ 261, 664), and burglary (§ 459). The jury sustained personal use of a knife allegations as to each offense (§ 12022, subd. (b)); in conjunction with the attempted murder, it sustained allegations that defendant inflicted great bodily injury (§ 12202.7) and that his victim was a person over 60 years of age (§ 1203.09). The jury also sustained two special circumstance allegations, felony-murder burglary and felony-murder rape (§ 190.2, subd. (a)(17)), and defendant admitted a prior conviction for lewd, lascivious, and indecent assault on a child. After a penalty trial, the jury set the penalty at death. This court affirmed the judgment in its entirety. (*People v. McDowell* (1988) 46 Cal.3d 551, 557 (*McDowell I*).)

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

1

However, in 1997, the Ninth Circuit Court of Appeals, while affirming the federal district court's denial of defendant's petition for writ of habeas corpus as to the guilt phase, reversed its denial of the writ as to the death sentence on the ground that the trial court committed prejudicial error by failing to correct the jury's misapprehension as to what factors might be considered in mitigation on the issue of penalty. (*McDowell v. Calderon* (9th Cir. 1997) 130 F.3d 833 (en banc).)

The first retrial of the penalty phase, in 1999, resulted in a mistrial after the jury indicated it was deadlocked. After the second penalty retrial, also in 1999, the jury returned a verdict of death. The trial court denied defendant's application to modify the penalty (§ 190.4, subd. (d)) and sentenced him to death. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment.

## I.  FACTS PRESENTED AT SECOND PENALTY RETRIAL

### A.  Prosecution Evidence

#### 1.  Circumstances of the Crime

In May 1982, Frank and Diane Bardsley lived in the Hollywood hills of Los Angeles. To their north lived Theodore and Dolores Sum; to their south lived Lee D'Crenza. At that time, defendant, who was then 28 years old, had been staying with D'Crenza for about five months. D'Crenza knew defendant by an alias, "Gene Holland."[2]

In the afternoon of May 20, 1982, defendant broke into the Bardsley home. After attempting to rape Paula Rodriguez,[3] the Bardsleys' 28-year-old

---

[2]    After his arrest, defendant told an officer that his name was "Gene Hollon, Jr."

[3]    In order to simplify our discussion of the facts and law, we shall refer to members of the Sum, Rodriguez, and McDowell families by first name.

housekeeper, defendant stabbed her to death. Prior to the murder, defendant had come to the Bardsley home to use their telephone on at least six occasions. A day before the murder, Dolores had noticed defendant standing between the top of her property and the Bardsley property, looking down towards the Bardsley house; when he realized he had been seen, defendant hid behind a bush and then ran to the D'Crenza residence.

Dolores testified that on May 20, she and Theodore called the Bardsley residence after hearing "terrible" screaming emanating from it. When their call was answered, they heard screams, and then the call was disconnected. They had the Bardsleys' house key and immediately went to check on Paula because they knew she was their housekeeper and that she worked that day. When Theodore, who was 73 years old at the time, arrived at the front entrance, "a hand came out from the door and cut [Theodore's] throat" with a knife, in a motion from left to right. The couple called the police from their home, and paramedics took Theodore to the hospital by ambulance.

In his testimony, Theodore described the screams he and his wife heard while inside their house as "frantic" and "female."[4] He testified that when he arrived at the Bardsley home to check on Paula, the front door was closed but unlocked. He opened it slightly, looked inside, and called out, "Paula, where are you?" When no one answered, he opened the door wider, stepped inside, and called Paula's name again. Moments later, defendant appeared near the front entrance, naked and bloody. He made a sudden upward thrusting motion towards Theodore's neck. Theodore was cut by the knife in defendant's hand. Theodore pushed defendant's belly, defendant lost his balance, and Theodore was able to

---

**4** Theodore Sum died before the second penalty retrial. His prior testimony was read to the jury.

3

close the door and run home. It was there that Theodore realized there was a "big hole" in his throat and that he was bleeding profusely.[5]

When the police arrived at the Bardsley residence, they found Paula's body in the living area between a bar and a chair. Her legs were "spread," her skirt had been pulled up, and her underpants had been "cut or ripped."[6] Paula was not wearing any shoes; one plastic thong was found behind the front door; its match was found in the same room as Paula's body.

Paula had been stabbed four times. She would have died from the stab wound that went through her chest and hit her aorta "within about a minute." She had suffered a deep stab wound to her abdomen that likely was inflicted when she already was dying or in shock. Paula also had two superficial stab wounds, one to her chest and a "defensive wound" to her forearm. In addition, her hands had more than 15 knife wounds, including deep cuts across her fingers, in the web of one thumb, and on a palm; those wounds were consistent with injuries she would have received had she grabbed the knife "in a defensive maneuver to try to stop the stabbing process." Paula also had a cut on each side of her throat; they were consistent with wounds suffered when a knife is used to control a person's actions.

There was blood all over the living room, on the blinds, walls, carpet, sofa, and telephone. Officers found a pack of True cigarettes and a Bic lighter on the floor, although neither the Bardsleys nor Paula smoked. Defendant's fingerprints

---

[5]   The jury was read the statement, made by the trial court during Theodore's testimony at the first penalty retrial, that defendant's knife had inflicted an eight-to-nine-inch "roughly U-shaped" wound from one side of Theodore's neck to the other.

[6]   A criminalist later examined Paula's underpants and concluded the separation in the fabric was consistent with a cut but inconsistent with a tear.

4

and palm prints were found on the Bardsleys' bloodied telephone and on the inside of their front door.

Officers searched the residence for other victims or suspects. Upstairs, they discovered Paula's two-year-old baby, Valeria, unharmed in her stroller. No one else was in the house.

When Los Angeles Police Detective Henry Petroski arrived at the murder scene, he saw that the front doorknob had punched a hole in the wall, which led him to conclude the door had been opened "in a very forceful manner."[7] Petroski noticed blood on the sidewalk, the front door, and the entryway of the Bardsley residence. He followed a trail of blood that led from the house and went south and up the steps into the D'Crenza residence.

The door to the D'Crenza residence was open. In the kitchen Petroski found a bloodstained knife and bloodstains in the sink. He saw blood smears and drops on an upstairs linen closet door. In a bedroom, he found a bloody pair of men's shorts and saw blood smears on the shower's tile wall and handles. On the dining room table he noticed a blood-soaked roll of masking tape. In the living room he noticed several True cigarette butts in an ashtray.[8]

---

[7] Diane Bardsley testified there was a new dent in the wall behind the front door, she believed the doorstop had been broken as well, and there were gouges in nearby paint that appeared to have been made by something sharp scraping against the wall. She added that the plastic thongs found in her house belonged to Paula.

[8] Through prior testimony given by D'Crenza that was read to the jury, the prosecution presented evidence that the knife in evidence belonged to him and had been kept in a drawer in his kitchen, defendant smoked at the time of the murder, defendant had been sleeping on a couch when D'Crenza left his home the morning of the murder, there had been no bloodstains in the house when D'Crenza left that morning, and defendant owned a pair of shorts that looked like the bloodstained shorts found by Detective Petroski.

Once Petroski realized no one was home, he stepped outside, and noticed additional blood drops leading south of the D'Crenza residence. That trail ended at the driveway of a house on a nearby street. As Petroski bent down to circle the last bloodspot with chalk, he heard a voice say, "Don't shoot me, don't shoot me" and "I give up." At some point, the person said, "I'm bleeding." Petroski drew his gun and ordered the person to come out from the nearby bushes. Defendant, who responded that he was "stuck," obeyed an order to show his hands, and Petroski could see they were cut and bleeding.

Officers who arrived to assist Petroski pulled defendant from the bushes. Petroski then heard defendant make a number of statements in a loud and belligerent manner, including, " 'Hey, I'm good for a rape in Florida too,' or something to that effect." Defendant, who was shirtless when arrested, had a cut to one wrist "serious enough to leave a continuous blood trail." He was transported to a hospital for medical treatment. At the time of the arrest, defendant was carrying a California identification card in the name of "Gene Hollon." The arrest occurred approximately two hours after the murder and less than a quarter-mile from the D'Crenza residence.

During the ride to the hospital and his stay there, defendant made several statements to officers assigned to watch him. He told Officer Michel his name was "Gene Hollon, Jr.," and several times pleaded with Michel to shoot him, once saying, "Take out your .357 and shoot me in the head." Defendant commented that the day before Paula's murder, he had been watching a television program when he "felt a force come over his body," that he felt the same force when he was "hurting the girl," and that he could not control that force. He also said he had "hurt" Paula because he had worked on the D'Crenza house all day, but when D'Crenza came home, D'Crenza had not appreciated the work defendant had done. Defendant added that he was surprised by Paula's strength and that "she

6

had put up quite a fight." At the hospital, when a police technician observed defendant's hands, defendant stated, "That would be my blood. Her blood would be on my stomach." Defendant told Michel he was using an alias because he was wanted for rape in Florida, that he was a habitual criminal, that he was a "Hitler buff," and that if Michel did not shoot him, he "would just go out and do it again."

Defendant was at the hospital for between six and seven hours. He then was transported to the police station.[9]

With regard to the issue of whether defendant had been intoxicated at the time of Paula's murder, the prosecution presented testimony from Detective Petroski and Officer Michel that defendant did not appear to be "under the influence of anything" during the trip to the hospital, during the hospital stay, or at the Hollywood police station.

The trial court told the jury it was taking judicial notice of the following facts: on August 16, 1984, defendant was convicted by a jury of the first degree murder of Paula, attempting to murder Theodore, attempting to rape Paula, and burglarizing the Bardsley residence; the jury had found true special circumstance allegations that the murder of Paula was committed during an attempted rape and a burglary, and that defendant used a knife in the commission of the offenses; and on February 24, 1977, defendant was convicted in Florida of victimizing Curtis M. A certified copy of the Florida conviction for lewd, lascivious and indecent assault on a child was received into evidence. (*McDowell I*, *supra*, 46 Cal.3d at p. 557.)

---

[9] The jury was shown a news videotape taken of defendant immediately after his arrest which was silent except for what defendant said at the time. The jury also was shown photographs of defendant taken at the police station that depicted how "defendant looked at the time of his arrest."

7

## 2. Prior Criminal Acts

The prosecution presented evidence concerning the following incidents of criminal behavior by defendant.

Defendant's younger sister Teressa testified that when she was a child, defendant "made [her]" urinate in his mouth.[10]

Defendant's ex-wife Rebecca married defendant in 1975 when she was 14 years old. She testified that during the time they were married, defendant beat her, choked her, forced her to have sex while holding a knife to her throat, gave her razor blades and told her to cut her wrists, and put items in her rectum.[11] Defendant told her he enjoyed the aberrant sexual things that he did to her, and Rebecca did what defendant wanted because he was "violent" and "very controlling." Rebecca testified that shortly after they were married, defendant made her aware that he was bisexual. Defendant's brother Thomas testified he saw defendant grab Rebecca by the hair and then drag her along the ground. Rebecca testified she had been "knocked out" during that incident and that defendant pulled her out of the house by her hair.

In 1977, while defendant was living in a trailer park in Florida, he enticed Curtis M., his four-year-old neighbor, to enter his trailer by promising Curtis a

---

**10** In determining penalty, a jury shall take into account, if relevant, "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) The trial court ruled this incident constituted criminal activity involving the use of force within the meaning of section 190.3, factor (b).

**11** On cross-examination, Rebecca added that she and defendant had lived with defendant's parents for several months, and that defendant's mother witnessed some of these acts of violence but only called the police once during that time. She also agreed that defendant's requests for abnormal sex became "more bizarre" over time.

quarter. Defendant took Curtis into his bedroom, locked the door, undressed, and had Curtis undress. Defendant had Curtis suck his penis, defendant sucked Curtis's penis, and defendant inserted his penis into Curtis's rectum. After Curtis got dressed, defendant gave him a quarter. Curtis reported to his parents that defendant had given him a quarter and "put his penis inside [Curtis's] behind." Curtis added that "his behind was hurting." Curtis's mother testified that she had "checked" him, found "redness on his rectum," and called the police. This incident led to the Florida conviction and to defendant's commitment to a Florida state hospital. While defendant was confined there, Rebecca left him and went into hiding for several years because she feared defendant would kill her if he found her.

In 1981, defendant told his brother Thomas that he would definitely kill Rebecca even if it was the last thing he ever did. He added that he would kill Thomas if Thomas "gave him a reason." Thomas compared defendant to a wild animal, "full of hate," like one "that's been shot." Thomas said he had known defendant "was going to hurt somebody, you could see it."

In 1981, 28-year-old Patricia H. met defendant after he began living in a tent near the house she shared with her six-year-old son, Paul. Paul met defendant as well. Both Patricia and Paul testified at the penalty retrial. A summary of their testimony follows.

On July 29, 1981, a week or two after Patricia met defendant, he knocked on their door in the evening. Defendant said he had been "mugged" and needed to use Patricia's telephone to call the police. He was naked except for tennis shoes, and asked for a towel to cover up. He covered himself with the towel, picked up the telephone, and appeared to speak with the police. Patricia said defendant could stay until the police arrived but became nervous when she noticed he was wearing jewelry. In response to her question, defendant said the muggers had

9

been in a hurry and had not taken everything. Defendant put on a pair of shorts. He sat with Patricia on a couch, said he wanted to make love to her, and tried to kiss her. Patricia declined, excused herself, called her friend Carol, asked Carol to call her back, and then told defendant to wait outside. When defendant left, Patricia called Carol and told her what had happened. They agreed Patricia and Paul would spend the night at Carol's house. While Patricia was on the telephone, defendant yelled through the window, "[L]ady, don't get all upset now. Nothing is going to happen."

As Patricia and Paul left the house and approached their car, defendant jumped from behind the car, grabbed Patricia, and said he now "was going to have it his way." Paul started to run and scream but stopped when defendant said he would kill Paul and his mother if he "didn't shut up." Patricia took Paul into the house after defendant warned that if she did not obey him, he would kill her and then "do it" to her son and then kill him.

Following defendant's demands, Patricia put Paul in his room and called Carol to say she had changed her mind. Defendant then ordered Patricia to take off her clothes. He then raped her, forced her to insert her fingers in his rectum, made her orally copulate him, had her fondle his testicles, made her crawl "like a dog" and sodomized her as she did so, shaved her pubic hair, and inserted a razor in her rectum. Throughout this sexual assault, defendant warned that if Patricia cried he would "do it" to Paul and then kill him. He also told Patricia "to make him feel loved." When Carol periodically called to see why Patricia had changed her mind, defendant had Patricia answer the phone. In one call, Carol asked if "that guy" had left, and Patricia said "no." When the police later called and asked if the perpetrator still was there, Patricia said yes.

After Patricia hung up, defendant had her orally copulate him again. He told her to hold his semen in her mouth and then put it in his mouth. However, as

10

soon as he ejaculated Carol called again, and he told Patricia to swallow and answer the phone. Defendant next had Patricia get him his cigarettes, he smoked one, and he asked for a glass of tea with a paper towel around it because he wanted to conceal his fingerprints, having "done enough time" to know "all the tricks." Defendant then took Patricia's keys, locked the deadbolt, handed the keys back, and told Patricia to wash them to remove his fingerprints. He then forced her back into the bedroom to engage in more sex acts.

When headlights lit Patricia's driveway, defendant assumed Carol had come and ordered Patricia to "get out there and make that cunt leave." It was not Carol, but Patricia's ex-brother-in-law. Patricia explained the situation and then broke Paul's bedroom window, lacerating her knees as she pulled him outside. As the three drove off, they passed police cars, so they returned. By the time police searched Patricia's house, defendant was no longer there.[12]

On cross-examination, Patricia testified defendant smelled "[o]f beer" when he tried to kiss her, but on redirect examination, she said she did not believe defendant was under the influence of alcohol during the sexual assault because he "[q]uite precisely" told her "what to do and how to do it."

---

[12] Paul testified that defendant had put him in his room when they went back inside the house and that he stayed in his room crying. Periodically, Paul's mother, who was then naked, would come into Paul's room and check on him. The telephone was in Paul's room. His mother answered it when it rang, while defendant stood behind her listening to the conversations. Paul testified he was in the bedroom for three to four hours and just heard muffled cries and rustling during that time until the front door slammed. Paul testified that everything seemed still for a long time after that until his bedroom window broke and he saw his mother and uncle. Paul ran to the window. He jumped out of the house and got into his uncle's car.

### 3. Victim Impact Evidence

Paula's husband, Jose, and her daughters, Maria and Valeria, testified regarding the impact of Paula's death on them. Jose, who had been married to Paula for nine years, testified he thought about her every day and "suffered every minute" since her death. In describing how Paula's murder affected him, Jose said his family was "not well" and that they were "not really united at all." Maria, who was age nine when Paula died, missed her mother and thought about her every day. Maria and her mother had discussed how together they would celebrate Maria's 15th birthday party, an "important" birthday in the "Mexican culture," but Maria did not have one. Maria was unmarried and did not intend to have children because she did not want "them to suffer the same way I'm suffering now and for the rest of my life without my parents." After Paula's death, Maria "had a problem" with her father and other members of her family, and, at the time of the second retrial, she was not close with her father. Valeria missed her mother although she had little memory of her. She thought about what her life would have been like had her mother lived and wondered if she would not be so estranged from her sister Maria.

### B. Defense Evidence

The defense introduced evidence from a number of witnesses that defendant had grown up in a highly dysfunctional family.

According to defendant's paternal aunt, Roberta Williams, defendant's father, Charles, Sr., was "very violent" towards his family members. He had a terrible temper and beat defendant and his siblings with a belt or with his fists during much of defendant's childhood. Williams described an incident when defendant was about five years old when defendant and his brother Ronald were throwing pebbles at a pony; in response, Charles, Sr., "beat them in the face" with his fist, bloodying their noses and then daring them to cry. Williams testified that

12

defendant's mother, Shirley, did not provide adequate care for defendant when he was an infant, giving him "curdled milk" to drink and keeping him in dirty diapers so long his "bottom" was "bloody." When defendant was older, Williams often saw Shirley beat defendant with a broom, slap his face, and beat him with her fist. While the family lived in Florida, Shirley briefly left her husband on several occasions; she would take the younger children and leave defendant and Ronald with Charles, Sr. Williams and other witnesses testified they never saw any positive interactions between defendant and his mother.

Defendant's mother, Shirley, testified that Charles, Sr., began beating defendant when he was a few weeks old "to make him go to sleep" because he would cry at night.[13] She said defendant was "whipped" by his father as a young boy "every day." When defendant was two or three years old, he wet his bed each night; in response, Charles, Sr., beat him every morning and sometimes rubbed defendant's nose in the urine. When defendant's brother Ronald was about the same age, he wet his pants; in response, his father pinched his penis so hard that Ronald had to have an operation to repair the damage. When defendant was five years old, he and his brother Ronald set their doghouse on fire; in response, Charles, Sr., removed their clothes and held them naked over the fire.

Defendant and his brothers often had bruises and welts where Charles, Sr., had hit them. Once Charles, Sr., threw a fork at defendant, which lodged in defendant's finger. Charles, Sr., beat any child whose report card did not meet his expectations. The children often could not tell what would "set [their father] off," but he would inflict multiple "licks . . . until the urge passed him." When one member of the family did something to provoke Charles, Sr., he often would beat

---

[13]    Defendant's mother, Shirley, died in 1997. Her prior testimony was read to the jury.

13

up everyone in the house. Charles, Sr., once "stomped" on his son Thomas, breaking one of his ribs, and he later continued to beat Thomas while he was in a body cast. Thomas testified there was no safe time or safe place in the house, that although all the sons were beaten, defendant, who was the oldest child, "got the worst" of Charles, Sr.'s beatings, and that the violence level of the father towards the family "escalated as time went on."

Once, when Charles, Sr., picked up his three-year-old daughter and smeared her face with paint she had spilled, defendant's mother tried to "wrestle" their daughter from him. Defendant, who was a teenager at the time, then hit Charles, Sr., on the top of his head with a two-by-four. In response, Charles, Sr., grabbed defendant by the throat and lifted his feet off the ground while Ronald begged him not to kill defendant.

Religion played a major role in defendant's family life. Charles, Sr., forced the family to attend church and also provided religious instruction in their home. If the children or Shirley resisted his preaching, which always concerned hell and damnation, Charles, Sr., would beat them. He regularly told his children they were sinners who were going to hell, while portraying himself as "perfect" and someone who would be "saved."

Several witnesses testified that Charles, Sr., was physically and verbally abusive towards his wife. He beat her in front of the children with a belt or with his fists. He broke or bloodied her nose on several occasions and left bruises on her. All of the children witnessed these beatings their entire childhood. Charles, Sr., would beat his wife if she tried to intervene on behalf of the children, and he once pointed a gun at her. He treated his wife "like a child," "cursed her," and called her names, telling her she was lazy, filthy, and incompetent.

Defendant's sister Teressa testified that their father, Charles, Sr., had sexually molested her as far back as she could remember, probably starting before

14

she was three years old. The molestations continued until Teressa was age 17, when she told her mother about the sexual abuse and Charles, Sr., moved out of the house. Charles, Sr., would come into her room almost every night through a hole he had created in the closet between their bedrooms, touch her until he had an ejaculation, and then cry and ask for forgiveness. Charles, Sr., also molested Teressa during the day on Saturdays when Shirley went shopping for groceries, and he made Teressa sleep in his bed during a period when Shirley was in the hospital. Teressa had to kiss Charles, Sr., when he came home from work each day, in a way a wife kisses a husband; if she did not, "there would be hell to pay" for the entire family. Thomas had caught Charles, Sr., in Teressa's bedroom and had seen them naked together, and Shirley once had found Teressa in bed with Charles, Sr. Shirley testified that when their children were teenagers, Charles, Sr., would accuse their sons of having sex with Teressa.

When defendant was a teenager, the family moved to Florida. A Florida neighbor, Bonnie Haynes, saw bruises on defendant, Ronald, and Thomas. In defendant's presence, the boys told Haynes that Charles, Sr., "whipped" them and had inflicted the bruises she saw on their arms, backs, and shoulders. After defendant's younger sister Belinda was hit by a car and killed, Haynes heard Charles, Sr., on several occasions spend an hour blaming his other children for Belinda's death while making them look at a large photograph of her. She also frequently saw bruises on the arms of defendant's mother. Haynes said Charles, Sr., never had "a kind word to say to the boys" and was "always real mean" to defendant, talking to him in a derogatory manner, criticizing him, telling him he was dumb and ignorant, and saying that he was going to hell. Defendant told Haynes he was "no good" and was "for sure going to hell." She described defendant's childhood as "pitiful" and said she did not think defendant or his

15

siblings "ever had a chance" because abuse was not reported to the authorities "back then."

Robbie Edwards, a registered nurse, testified she was defendant's primary therapist while he was in a mentally disordered sex offender (MDSO) program in Florida.[14] She testified that while under her supervision, defendant had seemed sincere about wanting some help. She evaluated his participation and graded him as very good or excellent, but she acknowledged that at one point defendant had a "homemade knife" on the ward, and that in 1977 the hospital staff concluded that while he had made some positive changes, defendant "still remained a menace to society based on his assaultive tendencies." Edwards testified defendant had reported several instances in which he was forced into homosexual acts, first by his uncles when defendant was nine or 10 years old, and later by employers, schoolmates, and members of a Boy Scout troop.[15] Edwards added that defendant told her he feared homosexual advances by other inmates on the ward, but she acknowledged a court-appointed psychiatrist had concluded that defendant's "sexual deviation" involved elements of homosexuality and pedophilia. Edwards also testified that another Florida doctor concluded defendant had a sociopathic character disorder. In 1979, Edwards and the staff recommended that defendant be returned to the court because he no longer met the definition of an MDSO under the Florida statute.

The defense called defendant's ex-wife Rebecca as its own witness. In that capacity, Rebecca testified she once had been in Teressa's room when Charles,

---

[14] Edwards was recovering from surgery and unable to travel at the time of defendant's second penalty retrial. Her prior testimony was read to the jury.
[15] Defendant's brother Thomas testified that he had witnessed defendant being molested by his mother's uncles.

16

Sr., stood outside the window and let his daughter Teressa know he was there. Rebecca testified that, in response, Teressa "was naturally frightened of him." Rebecca also described an incident that occurred when she was 16 years old, defendant was in the state hospital, she was moving to be near him, and Charles, Sr., was helping with the move. The two were in his truck en route to her new home when Charles, Sr., pulled his truck to the side of the road and "made a pass" at her, grabbing her face and trying to pull her towards him to kiss her. She rebuffed his sexual advances, and their trip continued without incident. Rebecca said that defendant's brother Ronald once lost his temper during a card game and slapped her. That was the only time she witnessed Ronald act in a violent manner, and she testified he was not violent like defendant.

Defendant's brother Thomas testified that the circumstances in which he and defendant grew up "made him what [he] had been in the past," namely, someone who "was convicted of rape, sexual abuse." Thomas decided never to have children because the "legacy that I was brought up with, sexual abuse, sexual misconduct, I don't want to pass that on to any children that I might have." At the time of the second penalty retrial, Thomas intentionally had been out of contact with his entire family, and he refused to tell the jury where he was living.

## II. DISCUSSION

### A. Constitutionality of the Second Penalty Retrial

Defendant contends "the long-delayed and repeated retrial of the penalty phase" violated his "state and federal constitutional speedy trial rights, rights to due process, and to freedom from cruel and unusual punishment." We conclude there is no merit to these constitutional challenges to the second penalty retrial.

### 1. Cruel or Unusual Punishment

Defendant contends the state's repeated retrials of the penalty phase in his case "after lengthy delays for which he was not responsible" constituted cruel and unusual punishment in violation of our state and federal Constitutions. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.)[16] We disagree.

The death row delays in the present case do not constitute cruel and unusual punishment because they resulted from the "desire of our courts, state and federal, to get it right, to explore . . . any argument that might save someone's life." (*Chambers v. Bowersox* (8th Cir. 1998) 157 F.3d 560, 570; see also *People v. Anderson* (2001) 25 Cal.4th 543, 606 (*Anderson*).) Reaching the same conclusion, the Fifth Circuit, in rejecting a claim that petitioner White had been on death row for so long that executing him would be cruel and unusual punishment, recognized that "there are compelling justifications for the delay between conviction and the execution of a death sentence. The state's interest in deterrence and swift punishment must compete with its interest in insuring that those who are executed

---

**16**    With respect to this and most other claims on appeal, defendant argues that the asserted error or misconduct infringed constitutional rights. At trial, he failed to assert some or all of the constitutional arguments he now advances. "In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

receive fair trials with constitutionally mandated safeguards. As a result, states allow prisoners such as White to challenge their convictions for years. White has benefitted from this careful and meticulous process and cannot now complain that the expensive and laborious process of habeas corpus appeals which exists to protect him has violated other of his rights." (*White v. Johnson* (5th Cir. 1996) 79 F.3d 432, 439.) Defendant similarly benefitted from challenging his conviction for many years and cannot successfully complain that the delay from the process of state and federal appellate and habeas review resulted in cruel and unusual punishment.

The fact that defendant prevailed on one of his claims in federal court and succeeded in obtaining a reversal of his initial death sentence does not alter our conclusion. In *Anderson*, we concluded the "automatic appeal process following judgments of death is a constitutional safeguard," and held that "appellate delay in a capital case is not cruel and unusual punishment." (*Anderson*, *supra*, 25 Cal.4th at p. 606.) We rejected a claim similar to that made here, although the defendant in that case initially had been sentenced to death in 1979, had his death sentence reversed in 1987 due to instructional error, and, after retrial of the penalty phase, was again sentenced to death in 1991. (*Id*. at p. 559.)

Defendant argues his case is different from *Anderson* in part based on his claim that he has suffered "agony" as a result of his prolonged stay on death row, and his belief that the prosecution should "acknowledge" the instructional error by the trial court in 1984 and seek a modification of defendant's sentence to life without the possibility of parole. None of defendant's arguments alter the fact that his situation is indistinguishable from that in *Anderson*, and we remain convinced that reasonable "appellate delay in a capital case is not cruel and unusual punishment." (*Anderson*, *supra*, 25 Cal.4th at p. 606.) In so holding, we reject, as we have in the past, the contention that execution after such an extensive delay

19

serves no penological purpose. (*People v. Ochoa* (2001) 26 Cal.4th 398, 463-464.)

### 2. *Speedy Trial and Due Process*

The Sixth Amendment speedy trial guarantee "is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." (*United States v. Ewell* (1966) 383 U.S. 116, 120 (*Ewell*); see also *Barker v. Wingo* (1972) 407 U.S. 514, 515 (*Barker*).)

Defendant contends the "delay of 15 years between the imposition of the death penalty in 1984 and the 1999 retrial(s)" violated his due process right to a speedy trial under our state and federal Constitutions. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15.)[17]

The United States Supreme Court has held that "when a defendant obtains a reversal of a prior, unsatisfied conviction, he may be retried in the normal course of events. [Citations.] The rule of these cases, which dealt with the Double Jeopardy Clause, has been thought wise because it protects the societal interest in trying people accused of crime, rather than granting them immunization because of legal error at a previous trial . . . . [This policy], so carefully preserved in this Court's interpretation of the Double Jeopardy Clause, would be seriously undercut by the interpretation given the Speedy Trial Clause by the court below," which had

---

[17]  Defendant relies on *Barker* to argue that the "Fourteenth Amendment's Due Process guarantee is also triggered." *Barker* explained that a defendant in state court has a "due process right to a speedy trial" (*Barker*, *supra*, 407 U.S. at p. 536), and defendant does not argue a due process violation separate from his speedy right claim. We therefore consider as one claim the issue whether defendant was deprived of his due process right to a speedy trial.

20

raised a Sixth Amendment obstacle to retrial after a successful attack on a conviction. (*Ewell*, *supra*, 383 U.S. at p. 121; see also *United States v. Loud Hawk* (1986) 474 U.S. 302, 313 (*Loud Hawk*).)

The delay in defendant's case is primarily attributable to the appellate process and defendant's collateral attack on his conviction and sentence. That process, like many of the other "procedural safeguards provided an accused," is "designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself. . . . 'The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.' [Citation.]" (*Ewell*, *supra*, 383 U.S. at p. 120.)

Here, the federal writ of habeas corpus was issued on September 15, 1998. On September 23, 1998, the Los Angeles Superior Court set the case for a penalty phase retrial. Defendant's first penalty retrial occurred 10 months after the issuance of the writ of habeas corpus, and defendant personally agreed to each of the time waivers during that period. We conclude defendant's speedy trial claim fails because the prosecution had the right to retry the penalty phase and did so in the normal course of events. (See, e.g., *Anderson*, *supra*, 25 Cal.4th at p. 603 [no speedy trial violation when retrial held three years after reversal of death sentence and defendant personally waived all delays except one].)

In support of his speedy trial and due process claims, defendant relies on the framework adopted in *Barker*, *supra*, 407 U.S. 514, which the high court used to evaluate speedy trial claims in criminal cases. That balancing test ordinarily requires us to weigh the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (*Id.* at p. 530.)

21

However, the first factor, the length of the delay, is the "triggering mechanism" for the *Barker* test: "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." (*Barker*, *supra*, 407 U.S. at p. 530.) "[T]he length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." (*Id*. at pp. 530-531, fn. omitted.)

*Ewell* supports the People's position that defendant's speedy trial claim accrued only after his federal petition for writ of habeas corpus was granted. In apparent agreement with this position, with respect to his penalty retrial, the defendant in *Anderson*, *supra*, 25 Cal.4th 543, "[did] not argue that his speedy-trial rights attached any earlier than the issuance of our remittitur" in the prior case reversing the defendant's death sentence. (*Id*. at p. 603.) Section 1382, subdivision (2), which mandates the dismissal of an action, unless good cause is shown, in any felony case in which the defendant is not brought to trial within 60 days of "the issuance of a writ or order which, in effect, grants a new trial," lends further support to the position that the delay between the issuance of the writ and his first penalty retrial is the length of delay to be considered with regard to defendant's speedy trial claim. We conclude that defendant's right to a speedy retrial of the death penalty phase of his case did not accrue until the issuance of the writ ordering a new penalty trial, and we agree with the People that the 10-month delay between the date the writ issued and the first penalty retrial was not presumptively prejudicial given the complexity of the case, the voluminous record of at least "15 boxes" of discovery that needed to be reviewed, and the difficulty the defense was having locating and bringing to court out-of-state witnesses.

Defendant does not argue otherwise. Accordingly, we need not inquire into the remaining *Barker* factors with regard to defendant's speedy trial claim.

Defendant relies on *Loud Hawk*, *supra*, 474 U.S. 302, to support his claim that it is the 15-year delay between the imposition of the death penalty in 1984 and the 1999 retrials that is presumptively prejudicial and that, accordingly, we must consider the remaining three *Barker* factors. Defendant's reliance on *Loud Hawk* for that proposition is misplaced. *Loud Hawk* did not involve a postconviction delay. Instead, in *Loud Hawk*, the United States Supreme Court considered the delay "occasioned by an interlocutory appeal when the defendant is subject to indictment or restraint" (*id*. at p. 312) in assessing "the extent to which appellate time consumed in the review of *pretrial motions* should weigh towards a defendant's speedy trial claim" (*id*. at p. 314, italics added). It was in the context of pretrial delay that the court recognized that the Sixth Amendment safeguards inherent in the guarantee to a speedy trial "may be as important to the accused when the delay is occasioned by an unduly long appellate process as when the delay is caused by a lapse between the initial arrest and the drawing of a proper indictment." (*Loud Hawk*, at p. 312.) The court in *Loud Hawk* cited with approval the portion of its decision in *Ewell* that explained that the speedy trial clause should not be interpreted in a manner that raises a Sixth Amendment obstacle to retrial following a successful attack on a conviction. (*Loud Hawk*, at p. 313, citing *Ewell*, *supra*, 383 U.S. at p. 121.)

Here, *defendant* availed himself of the judicial process to challenge his conviction and sentence by appeal and collateral review. " 'Having sought the aid of the judicial process and realizing the deliberateness that a court employs in reaching a decision, the defendant[] [is] not now able to criticize the very process which [he] so frequently called upon.' " (*Loud Hawk*, *supra*, 474 U.S. at pp. 316-317, quoting *United States v. Auerbach* (5th Cir. 1969) 420 F.2d 921, 924.)

23

Although the holding in *White v. Johnson*, *supra*, 79 F.3d 432, was rendered in the context of a cruel and unusual punishment claim, its reasoning applies in the context of defendant's speedy trial and due process claims as well. Here, where defendant has benefitted from the careful and meticulous process of judicial review, he cannot now complain that the process "which exists to protect him has violated other of his rights." (*Id*. at p. 439.)

We disagree with defendant's claim that the "state" is responsible for the appellate delay he suffered because the delay "is attributable to the trial court's instructional error." Such an argument would apply anytime a conviction is reversed or set aside on collateral attack, but *Ewell* established that the speedy trial clause of the Sixth Amendment should not be interpreted to act as an obstacle to retrial after a successful attack on a conviction. (*Ewell*, *supra*, 383 U.S. at p. 121.)

In the context of discussing "the limited class of cases where a pretrial appeal by the defendant is appropriate" and the weight to be attributed to delays caused by such interlocutory appeals, the court in *Loud Hawk* commented that while delays from such an appeal ordinarily will not support a speedy trial claim, a "defendant with a meritorious appeal would bear the heavy burden of showing an unreasonable delay caused by the prosecution in that appeal, or a wholly unjustifiable delay by the appellate court." (*Loud Hawk*, *supra*, 474 U.S. at p. 316.) While this statement appears to apply only to pretrial appellate delay, we simply note that here defendant does not specifically allege an unreasonable delay caused by the prosecution in his appeals or a wholly unjustifiable delay by the courts that handled his appeals and collateral attacks. No such delays are apparent from a review of the record in this case, which includes the relevant dockets of this court, the federal district court, and the Ninth Circuit Court of Appeals.

We conclude the prosecution of defendant's case, the direct appeal of the resulting conviction and death sentence, and the capital appellate and habeas

24

corpus process that ensued in this court and the federal courts did not cause any unreasonable or unjustifiable delay. Instead, the judicial process, including the appellate process from which defendant benefitted, was a constitutional safeguard based on the desire of state and federal courts to explore any argument that possibly could save defendant's life. (*Chambers v. Bowersox*, *supra*, 157 F.3d at p. 570.) Having used the appellate process to his advantage, defendant cannot return to the trial court "to reap the reward of dismissal for failure to receive a speedy trial." (*Loud Hawk*, *supra*, 474 U.S. at p. 316.)

## B. Excusal of Two Prospective Jurors for Cause

Defendant contends the trial court erred by excusing prospective jurors, No. F6136 and No. R9529, for cause, over his objection, because of their views on the death penalty. "[T]he erroneous exclusion of a prospective juror because of that person's views on the death penalty is reversible per se." (*People v. Cooper* (1991) 53 Cal.3d 771, 809, italics omitted, citing *Gray v. Mississippi* (1987) 481 U.S. 648.) Here, for the reasons stated below, we find no error.

"The trial court may excuse for cause a prospective juror whose views on the death penalty would prevent or substantially impair the performance of the juror's duties. On appeal, we uphold the trial court's ruling if the record fairly supports it, and we accept as binding the trial court's determination of the juror's true state of mind if the juror has made conflicting or ambiguous statements." (*People v. Cleveland* (2004) 32 Cal.4th 704, 735; see also *People v. Mayfield* (1997) 14 Cal.4th 668, 727.)

We have reviewed the record as to the two prospective jurors in question, and we find no basis on which to overturn the trial court's rulings. The two said some things that suggested they could be fair to both sides and that they could impose the death penalty if appropriate. They also gave conflicting and

25

sometimes ambiguous statements and responses to questions regarding the death penalty that suggested that their views would prevent or substantially impair their ability to perform their duties in the penalty phase of a case in which the prosecution intended to argue for the death penalty. Significantly, each made statements that supported the trial court's findings that her views would substantially impair her ability to serve as a juror in defendant's penalty retrial.

In her questionnaire, Prospective Juror No. F6136 wrote that she hoped the death penalty "will be abolished some day." She explained to the trial court that she had read that the death penalty serves no purpose and does not act as a deterrent to crime. She also told the trial court that she believed life without the possibility of parole was a greater penalty than death. In response to the prosecutor's questioning, she clarified that it was her own belief that the death penalty "has no value" as a deterrent of crime. She then acknowledged that her feelings regarding the death penalty "could" impair or influence to a substantial degree her "ability to decide this case on the issue of punishment" and that her favoring life without the possibility of parole as a punishment "could" affect her ability "to be fair and impartial to the prosecution in this case." The trial court excused this juror, stating that "based on the answers she's given orally, it did seem to me that she was substantially impaired" in her ability to perform her duties as a juror in defendant's case.

In her questionnaire, Prospective Juror No. R9529 wrote, "I really do not believe in the death penalty," that she was "moderately against it," and that she felt that when a defendant is sentenced to death he "got off easy." She also wrote that she did not believe "people should decide if someone should die whether they are doing the killing physically or verbally." She additionally wrote that in her opinion life without the possibility of parole is "much" worse than death. In answering whether she would always vote against death, she circled "no," but then

26

put a question mark by it. On page 15 of her questionnaire, she circled "no" in response to the following question: "In a case that involved the special circumstance of murder in the commission of attempted rape, could you impose the death penalty depending on the aggravating evidence to be offered in the Penalty Phase?"

Responding to questioning by the trial court, Prospective Juror No. R9529 said that "[i]f it was up to me, I wouldn't want to" vote for the death penalty. Once the court explained to her that no juror would be told "you have to vote for the death penalty," she admitted she was "not sure," and "really [did not]" know, whether she would ever vote for the death penalty. In response to the prosecutor's questioning, she mentioned that she "would rather die than spend [her] life in prison." In the course of challenging her for cause, the prosecutor noted for the record that she "got very angry with me . . . when I asked her questions about the death penalty," and that "her initial answers were that she was against the death penalty, that she couldn't impose the death penalty and that she would not impose the death penalty."

The trial court excused this juror, explaining that "although there is some ambiguity in what she said, it's clear to me that she is substantially impaired" in her ability to perform her duties as a juror in defendant's case. The court specifically noted that initially in her questionnaire, she was "saying she doesn't believe in [the death penalty], she's moderately against it. She said as to always vote against death, she circled no, but she put a question mark by that, and that's really the nature of her position. [¶] She also said on page 15 could you impose the death penalty, she circled no."

"In light of the [jurors'] conflicting and ambiguous statements, we must accept the trial court's determination of [their] true state of mind. As the United States Supreme Court recently explained, 'Deference to the trial court is

27

appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.' (*Uttecht v. Brown* (2007) 551 U.S. 1, [9].)" (*People v. Kelly* (2007) 42 Cal.4th 763, 778.) Here, as in *Kelly*, "[n]o error appears." (*Id*.)

Defendant cites other statements by each of the two prospective jurors that would have supported keeping them as jurors. "The question before us as a reviewing court, however, is whether the evidence supports the actual rulings, not whether it would have supported different rulings." (*People v. Smith* (2003) 30 Cal.4th 581, 602.) On this issue, defendant relies on *People v. Pearson* (2012) 53 Cal.4th 306, in which this court found that the trial court erroneously excused a prospective juror who consistently indicated that she could consider both death and life without possibility of parole. (*Id*. at pp. 332-333.) *Pearson* is distinguishable. Here, by contrast, the record in the present case supports the trial court's findings that the views of the two prospective jurors would have substantially impaired the performance of their duties.[18]

## C. Victim Impact Evidence and Related Instructions

Defendant contends the trial court erroneously admitted victim impact testimony regarding the broken relationship between Paula's husband and their

---

[18] With regard to this issue, defendant has suggested that the trial court improperly failed to grant a defense request to excuse for cause a prospective juror defendant considered to be "pro-death." Defendant acknowledges he has not preserved a claim of erroneous denial of a defense challenge for cause, but he asks us to consider the facts regarding the denial of his request for excusal for cause of the prospective juror in question "in evaluating the trial's excusals for cause of Prospective Jurors F6136 and R9529." We have done so. Those facts do not alter our conclusion. We simply note that the record supports the trial court's finding that the views of the challenged prospective juror would not have substantially impaired the performance of her duties.

28

daughter Maria. He contends the court compounded its error by instructing the jury that the victim's family members were prohibited from giving their opinions as to the punishment they felt defendant deserved. Defendant also claims the timing of the evidence's admission deprived him of sufficient opportunity for his counsel to "appropriately . . . challenge the legitimacy of the prosecution's spin on the family's estrangement."

"A State may legitimately conclude that evidence about . . . the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." (*Payne v. Tennessee* (1991) 501 U.S. 808, 827.) "The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' [Citation.]" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056.) Under California law, "[u]nless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones . . . is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*Id.* at pp. 1056-1057.) The circumstances of the crime under this factor "extend to that which surrounds the crime materially, morally, or logically." (*People v. Hamilton* (2009) 45 Cal.4th 863, 926.)

We find no merit in defendant's claims that the challenged evidence was "too attenuated in time and logic to be relevant," and that "its reliability was questionable." The longstanding rift between Paula's husband and their daughter Maria was relevant evidence that reminded the jury that the victim's death " 'represents a unique loss to . . . [her] family.' " (*Payne v. Tennessee*, *supra*, 501 U.S. at p. 825.) The trial court did not err by finding that evidence of a family's continued suffering over nearly two decades, including evidence of the long-term estrangement, was admissible. (*People v. Hamilton*, *supra*, 45 Cal.4th at pp. 923-927 [evidence victim's husband suffered depression for over 16 years after her

death, his alcoholism near the end of his life, his refusal to attend family reunions, and his loss of custody of his sons due to his unending despair was admissible victim impact evidence]; *People v. Boyette* (2002) 29 Cal.4th 381, 441 [evidence victim's father did not want to be around his other children after the murder was admissible victim impact evidence].)[19]

We also find meritless defendant's claim that evidence that the rift was caused by Paula's murder was unreliable and "collateral" because "there was a question whether the rift had indeed occurred because Maria was mad at her father for remarrying too quickly." That the defense told the trial court during pretrial litigation in the first retrial that there was "also evidence" that the rift was the result of Jose's remarriage does not establish that the trial court erred by admitting testimony regarding the rift as victim impact evidence. The prosecutor had advised the trial court that he had proof Maria was holding her father responsible for her mother's death, and nothing in the family's testimony contradicted that assertion. Defendant was entitled to request an Evidence Code section 402 hearing to question Jose and Maria about the cause of their estrangement outside the presence of the jury. Defense counsel indicated that after Jose's testimony he intended to "do a 402 as to the extent of the alienation and the reasons for it" but counsel did not follow through and request such a hearing. Absent evidence that the cause of the estrangement was Jose's remarriage, the defense theory did not provide a basis to exclude the otherwise relevant, admissible victim impact testimony.

---

[19]    In that regard, we note that without objection, the victim's younger daughter, Valeria, testified she feels that she "wouldn't be so estranged" from Maria, her older sister, if their mother had lived.

30

We additionally conclude that the evidence of the rift caused by Paula's murder was "not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case" (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180), nor was it "so unduly prejudicial" as to render defendant's trial "fundamentally unfair." (*Payne v. Tennessee*, *supra*, 501 U.S. at p. 825.) The challenged testimony was a brief statement without detailed explanation, and it "could not reasonably be seen as having encouraged an inappropriate response by the jury." (*People v. Benavides* (2005) 35 Cal.4th 69, 107.)

Defendant's argument regarding the timing of the evidence focuses on his complaint that the prosecutor, in deciding to introduce the challenged evidence during the testimony of the victim's husband, made "an abrupt about-face without giving the other side an opportunity adequately to contend with the change" in the prosecution's position from the first retrial, and that this was "the quintessence of sandbagging." In response to the People's argument that defendant's "real complaint appears to be that the prosecutor engaged in some kind of misconduct by eliciting the family estrangement testimony in the second retrial," defendant specifically states that he is "not raising a misconduct claim here." We conclude defendant's timing claim that the prosecutor's "sandbagging" deprived him of the opportunity "to litigate this volatile evidence in a nonvolatile situation" does not support a claim of trial court error.

Defendant received adequate notice that the prosecution intended to introduce victim impact evidence concerning the estrangement in Paula's family. Section 190.3 provides that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time . . . ." "The statute does not require production of the evidence, however, but notice of it. (§ 190.3.)" (*People v. Roberts* (1992) 2 Cal.4th 271, 330.) Here, the prosecutor provided notice that

Maria and her father would be called to testify about the impact of Paula's murder on them. "The defense was not entitled to a summation of the witnesses' expected testimony." (*Ibid.*; see also *People v. Scott* (1997) 15 Cal.4th 1188, 1219.) The family estrangement aspect of the family members' testimony was discussed before and during the first retrial, and defendant recognizes that the trial court never issued a ruling on its admissibility at the first retrial. The fact that the prosecutor chose not to introduce any evidence of the estrangement during the first retrial did not preclude the presentation of that evidence in the second retrial. (*People v. Barragan* (2004) 33 Cal.4th 236, 247.)

To the extent defendant contends his federal constitutional rights were violated by a lack of notice that left him with an insufficient "opportunity to prepare a defense to the aggravating circumstances," those claims have been forfeited by defendant's failure to raise them in the trial court. (*People v. Huggins* (2006) 38 Cal.4th 175, 238.) The claims also fail on their merits as defendant was given adequate notice of the victim impact testimony. Here, as in *People v. Roberts*, *supra*, 2 Cal.4th at page 330, "[t]here was no state error. Nor was there any Sixth Amendment violation. (See *Pennsylvania v. Ritchie* [(1987)] 480 U.S. 39, 52-53 [pretrial discovery request].)"

Finally, any deficiency in the notice was harmless because defendant failed to request a continuance to meet the evidence, decided not to conduct an Evidence Code section 402 hearing to obtain more information regarding the cause of the estrangement, and has not explained how he could have rebutted or impeached the prosecution witnesses had he received notice earlier. (*People v. Hinton* (2006) 37 Cal.4th 839, 900; *People v. Benavides*, *supra*, 35 Cal.4th at pp. 106-107; *People v. Roldan* (2005) 35 Cal.4th 646, 734.)

Defendant next contends the trial court committed prejudicial error when, at the prosecution's request, it instructed the jurors that the victim's family members

32

were not allowed to offer their opinions regarding what punishment they hoped defendant would receive.[20] He essentially concedes the instruction "correctly reflected the law" but argues the error and prejudice arose because the court "specifically instructed *that this kind of evidence was inadmissible*." We find neither error nor prejudice.

Victim impact testimony does not include opinions regarding the appropriate punishment. Such testimony by the victim's family or friends is not permitted. (*People v. Smith*, *supra*, 30 Cal.4th at p. 622.) It was not error to give the requested instruction to forestall the jury from improperly considering why the family members did not offer opinions on the appropriate punishment during their victim impact testimony. (See, e.g., *People v. Thompson* (1988) 45 Cal.3d 86, 131-132 [would not be error to give requested instruction that the jury was not to consider deterrent effect of the death penalty or monetary cost of execution or maintaining a prisoner for life].)

In *People v. Abilez* (2007) 41 Cal.4th 472, the defendant claimed the provision of accessory-after-the-fact verdict forms for his codefendant but not for him led the jury to understand the trial court credited the codefendant's testimony or believed defendant was the more culpable of the two. We found defendant's "unsupported assertion" of jury confusion to be "pure speculation." (*Id*. at p. 521.)

Similarly, in the present case, nothing in the instruction or the record supports defendant's speculative and unsupported claims that the jury understood the instruction to mean the victim's family wanted defendant to be executed or

---

[20] In response to the prosecutor's request, the trial court instructed the jury that as "victim's family members testify, Ms. Rodriguez's family members testify, their opinion, their desire about the penalty that should be imposed in this case is not legally admissible, so they can't be asked questions about that."

that the instruction "erected a barrier" that prevented the jury from considering his mitigating evidence. We presume the jurors understood and followed the challenged legally correct instruction (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005), as well as the instruction that advised that they could not impose the death penalty as a result of a purely emotional response to evidence that may have aroused in them "a natural sympathy for the victim or the victim's family." (CALJIC No. 8.85.)

To the extent defendant claims the challenged instruction violated his state and federal right to trial by jury, those claims fail on the merits for the reasons stated above.

### D. Exclusion of Defense Expert Opinion Testimony

Defendant contends the trial court erred by excluding the proffered defense expert opinion testimony from Dr. Arlene Andrews. Dr. Andrews had testified at defendant's first penalty retrial, in her capacity as a social worker, to the effect that defendant's childhood could have affected his adult behavior. Defendant claims the exclusion of this proffered mitigation evidence in his second penalty retrial violated his "Eighth and Fourteenth Amendment rights and their state constitutional analogues." For the reasons stated below, we find no abuse of discretion in the trial court's decision to exclude the expert opinion testimony on the ground that the jury did not need the opinion expressed by Dr. Andrews in her proposed testimony to assist it in ascertaining whether defendant's childhood could have affected his behavior as an adult.

#### 1. The Trial Court's Rulings

Dr. Andrews is a professor of social work who has a Ph.D. in psychology. At the first penalty retrial, she testified as a social worker and acknowledged that she was not in court to testify as a psychologist. Dr. Andrews testified that she

34

was paid to conduct a "social history assessment" of defendant. The primary question she explored was whether there were factors in defendant's "family environment that may have affected his behavior as an adult." She "looked at his behavior as an adult and then looked at issues in this family history that may have in some way influenced" that behavior. She did not rely on postarrest psychiatric reports because she only was "looking into [defendant's] past."

At the first penalty retrial, Dr. Andrews showed the jury a chart of defendant's "family tree," including the order of births, marriages, and deaths. In conjunction with the chart, she noted that defendant was sexually molested by two uncles who were only slightly older than defendant. After explaining that "typically" there are "critical life events" that "in some way shape the behavior of the individual," Dr. Andrews testified that the earliest critical event in the present case was that defendant's mother was beaten by defendant's father while defendant was in utero. She then described other critical events, such as defendant's mother not wanting to be pregnant and being "unprepared to be a mother," defendant's premature birth, defendant's mother becoming ill shortly after he was born, and the hostile relationship between defendant's parents that led to his mother being verbally and physically abused. Dr. Andrews noted that defendant's father beat his children "on an almost daily basis," often with a belt buckle, and engaged in other forms of physical abuse, such as holding the children over a fire, pushing a child onto a board with a nail in it, and knocking his children out of their seats at the dinner table. She added that the father also engaged in spiritual abuse, in which the reading of the Bible often precipitated beatings; animal abuse, including shooting a pet dog in the presence of defendant's brother; and sexual abuse, including repeated molestations of defendant's sister. Dr. Andrews testified that being exposed to such constant violence, living in a "sexualized" environment, and having parents who lacked the emotional energy to

35

pay attention to their children's developmental and emotional needs "can induce" social and emotional problems, such as a deficiency in moral and social education, learning to deal with disagreements by resorting to violence, a fear of abandonment, and becoming a sex offender.

In a bench conference outside the presence of the jury near the conclusion of Dr. Andrews's direct testimony, the trial court commented, "Well, so far I haven't heard an ultimate opinion by this witness." When the court asked whether her opinion would concern "the mental state at the time of the commission of the offense," defense counsel responded, "That's not going to be her ultimate opinion," and that instead her opinion would be that the abuse defendant experienced in his family "had a substantial impact on the development of his character. That's the end of it."[21] The court replied, "Substantial impact? The jury could figure that one out." It added, "She's gone through a lot of things we've already heard from the actual witnesses, and if that's her opinion, we don't need an expert to say that," because "[o]bviously what has been suffered by [defendant] would have a substantial impact on anybody."

When testimony at the first penalty retrial resumed, Dr. Andrews testified that the complete lack of a social support network for defendant during his childhood had an impact on his development. When asked for her ultimate opinion, Dr. Andrew stated that the severe physical, emotional, and sexual abuse, as well as the emotional neglect, had a "serious effect" on defendant's "social development and social functioning." She concluded her direct testimony by

---

[21] We emphasize that Dr. Andrews admitted she was not qualified to express an opinion as a medical or psychological expert regarding defendant's mental state at the time of the offense. We also note that nothing in the record suggests Dr. Andrews was qualified to explain the causal links, if any, between defendant's horrific childhood and the crimes he committed.

saying that as a result of his abusive childhood, defendant developed "minimal adaptive coping habits," such as the chronic use of alcohol and drugs, that he was unable to form healthy relationships, and he was prone to committing sexual offenses and being physically violent.

At the conclusion of her testimony, Dr. Andrews agreed with the prosecutor that her "ultimate conclusion is that if you have a bad childhood, it can affect you as an adult." When asked, "Isn't that really all you've told us?," Dr. Andrews answered, "Yes - - well, that's with details" to support that conclusion. She was then asked again, "And your ultimate opinion is again people that have bad childhood[s] may have had bad adulthood[s]? Is that basically it?" Dr. Andrews answered, "They may have," and that here, "there were some very clear linkages between what happened in childhood and how [defendant] behaved as an adult" up until the "time of the crime." She then conceded that people who have had a similar childhood to the one that defendant experienced do not necessarily become murderers, rapists, burglars, or pedophiles. Defense counsel admitted to the court that Dr. Andrews is not "a mental health professional" and "does not have the credentials or the background" to render an opinion on defendant's mental health. Immediately after Dr. Andrew's testimony in the first retrial, the trial court commented that had it "fully understood where she was going" with her testimony, "I probably would not have allowed her to testify."

In the second penalty retrial, the trial court ruled that the proffered testimony of Dr. Andrews was not the proper subject of expert opinion testimony. As the court put it, "the bottom line is, does it take an expert to say the defendant was affected by his family life? The answer is under section 801 of the Evidence Code, the answer is no, it doesn't." In ruling to exclude Dr. Andrews's testimony, the trial court again indicated that, had it known the nature of Dr. Andrews's ultimate conclusion, it "would not have allowed the testimony to proceed" during

37

the first retrial. The court added, "But at that point the door had been opened, it was too late to close the door, but now it's not." After considering all of Dr. Andrews' testimony from the first retrial, the trial court reiterated that an expert was not needed to testify that "the way you're raised is going to affect you as an adult." Explaining its decision to exclude Dr. Andrews's expert opinion testimony from the second penalty retrial, the trial court commented, "I try the case as best I can based on the law that I have and the assessment I can make of the admissibility of the evidence."

### 2. Standard for Admission of Expert Opinion Testimony

"Expert opinion testimony is admissible only if it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Watson* (2008) 43 Cal.4th 652, 692, quoting Evid. Code, § 801, subd. (a).) "When expert opinion is offered, much must be left to the trial court's discretion." (*People v. Carpenter* (1997) 15 Cal.4th 312, 403.) The trial court has broad discretion in deciding whether to admit or exclude expert testimony (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196), and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion. (*People v. Alcala* (1992) 4 Cal.4th 742, 788-789 (*Alcala*); see also *People v. Lindberg* (2008) 45 Cal.4th 1, 45.)

### 3. Abuse of Discretion

Here, as in *People v. Prince* (2007) 40 Cal.4th 1179, the trial court "obviously *exercised* its discretion" by giving "very careful attention to the issue." (*Id*. at p. 1222.) The court had heard Dr. Andrews testify during the first retrial and carefully considered whether such testimony was sufficiently beyond the common experience of jurors to warrant its admission. For the reasons stated below, we conclude the trial court did not abuse its discretion in concluding the

jury was capable of evaluating whether defendant's childhood could have affected his adult behavior without expert opinion testimony on that issue. In other words, the trial court acted within its discretion in finding that the proffered expert opinion testimony was not "sufficiently beyond common experience" that it "would assist the trier of fact." (Evid. Code, § 801, subd. (a).)

In *Alcala*, *supra*, 4 Cal.4th 742, this court found no abuse of discretion when the trial court refused to admit expert testimony as to the credibility of an eyewitness's professed memory loss that resulted in a finding that she was unavailable to testify. In so holding, we noted that the trial court's ruling was consistent with the judicial policy disfavoring attempts to impeach witnesses by means of psychiatric testimony, and that California courts have viewed such examinations with disfavor, in part, because " ' "the psychiatrist may not be in any better position to evaluate credibility than the juror." ' " (*Id*. at p. 781, from *People v. Manson* (1976) 61 Cal.App.3d 102, 137-138; see also *People v. Czhara* (1988) 203 Cal.App.3d 1468, 1478 [psychiatrist's testimony on adequacy of provocation excluded as not a subject beyond common experience].)

In *People v. Johnson* (1993) 19 Cal.App.4th 778 (*Johnson*), the defense wanted to call two expert witnesses on the unreliability or lack of credibility of statements or testimony of prison inmates. One of the proposed witnesses, a professor with a Ph.D. in sociology, "had studied the prison environment, and would have given what the trial court despairingly described as 'a sociological study in this courtroom about what happens in prisons.' " (*Id*. at p. 786.) The appellate court found no abuse of discretion in excluding this proffered testimony on the ground that it was of dubious testimonial value for several reasons, including that "there was no need for a sociological lecture on the nature of the prison environment—the jury learned plenty about that subject from the other evidence," and "the prospective abandonment of common sense by lay jurors for

39

reliance on paid 'expert' testimony covering a subject well within a jury's ken." (*Id*. at p. 791.)

Here, as in *Alcala* and *Johnson*, the expert opinion testimony of Dr. Andrews from the first penalty retrial covered a subject commonly understood by jurors. The essence of her proposed testimony was that defendant's childhood could have affected defendant's behavior as an adult, not how defendant's specific childhood experiences influenced the crimes he committed as an adult. The expert opinion testimony was neither technical nor complex, and the trial court could reasonably have found that it would not assist the trier of fact because it addressed a matter readily understood by lay jurors. (*Alcala*, *supra*, 4 Cal.4th at p. 781; *Johnson*, *supra*, 19 Cal.App.4th at p. 791.) We conclude the trial court acted within its discretion by deciding "there was no need for a sociological lecture" (*Johnson*, 19 Cal.App.4th at p. 791) on the nature of defendant's abusive childhood, as the jury had evidence on that subject from several other witnesses, and the jurors could rely on their common sense to consider whether defendant's abusive childhood could have affected his adult behavior, including his criminal behavior.

The recent opinion by the United States Supreme Court in *Wong v. Belmontes* (2009) 558 U.S.___ [130 S.Ct. 383], supports our conclusion this type of expert opinion mitigating evidence may be excluded on the basis that it would not assist the trier of fact. In that case, the court considered whether Belmontes was deprived of effective assistance of counsel during the penalty phase of his capital murder trial by counsel's failure to introduce additional "humanizing evidence about Belmontes' 'difficult childhood,' " beyond the "substantial" mitigation evidence counsel had presented. (558 U.S. at p. ___ [130 S.Ct. at p. 388].) The Ninth Circuit had determined that the evidence defense counsel presented and the additional evidence it proposed would have carried greater

40

weight had counsel submitted expert testimony that could " 'make connections between the various themes in the mitigation case and explain to the jury how they could have contributed to Belmontes's involvement in criminal activity.' [Citation.]" (*Ibid*.)  In reversing the Ninth Circuit's finding of prejudice, the high court concluded that "the body of mitigating evidence the Ninth Circuit would have required [the defense counsel] to present was neither complex nor technical. It required only that the jury make logical connections of the kind a layperson is well equipped to make.  The jury simply did not need expert testimony to understand the 'humanizing' evidence; it could use its common sense or own sense of mercy." (*Ibid*.)

While we find no abuse of discretion in the exclusion of the expert opinion testimony in this case, we recognize that defense counsel in a capital case "should secure an independent, thorough social history, of the accused well in advance of trial." (*In re Lucas* (2004) 33 Cal.4th 582, 708; see also *Wiggins v. Smith* (2003) 539 U.S. 510, 521-525.)  In this case, defense counsel obviously obtained such a social history of defendant, and presented a substantial amount of evidence that revealed defendant's unusually abusive childhood.  Our finding that the trial court did not abuse its discretion in deciding to exclude proffered defense expert opinion mitigating evidence is based on the particular circumstances of this case, including the voluminous mitigating evidence already before the jury and the precise nature of the proposed expert opinion.  We do not intend to imply that trial courts should routinely exclude any expert opinion testimony from a licensed social worker who has prepared a social history of a defendant in a capital case.

Defendant argues that Dr. Andrews rendered several "other expert opinions" in her first retrial testimony, including her testimony that experiencing beatings as a child and "witnessing parental beatings can induce a number of social problems in a child"; can teach "that violence is the way to deal with

41

disagreement"; and can produce " a level of terror" that " 'induces . . . severe emotional problems in children.' " Such testimony did not constitute "other expert opinions," as defendant argues here, but were the "details" Dr. Andrews conceded that she included to support her ultimate conclusion that defendant's upbringing could have affected his behavior as an adult. We have considered all of the testimony of Dr. Andrews from the first penalty retrial in reaching our conclusion that the trial court did not abuse its discretion in excluding the expert opinion evidence on the basis that it would not have assisted the trier of fact.[22]

Defendant's reliance on *People v. Smith* (2005) 35 Cal.4th 334 is unavailing. In *Smith*, a psychologist called by the prosecution testified about the three specific stages children go through during a "sadistic" molestation, namely, a feeling that "the experience is unreal"; a realization that "they are in danger," which may lead to attempts to avoid the molestation "by making friends with the abductor"; and feelings of "shame" and an increased awareness "that they may be killed." (*Id*. at p. 363.) This court found the expert opinion testimony, which focused on the thoughts a child would entertain while experiencing a specific and unusual type of assault, was properly admitted because it focused on a subject beyond the common experience of an ordinary juror. (*Ibid*.) Here, by contrast, the trial court did not abuse its discretion in determining that the essence of the proffered expert opinion testimony, namely, that "if you have a bad childhood it can affect you as an adult," did not require expert opinion testimony.

---

[22] We do not consider whether a trial court reasonably could have admitted the expert opinion evidence in this case. Our only inquiry, as noted above, is whether the trial court's decision to exclude the expert opinion testimony constituted an abuse of discretion. (*Alcala*, *supra*, 4 Cal.4th at pp. 788-789.)

Defendant's reliance on cases in which "trial attorneys have failed to present relevant social history testimony" (see, e.g., *Jackson v. Calderon* (9th Cir. 2000) 211 F.3d 1148, 1163) is similarly misplaced.  Here, by contrast, defendant's attorney compiled a social history of defendant and presented several witnesses who described in great detail the abusive conditions in which defendant had been raised.

Defendant also relies on *Fulgham v. State* (Miss. 2010) 46 So.3d 315, in which the Supreme Court of Mississippi reversed a death penalty verdict for the erroneous exclusion of proposed expert mitigation testimony from a licensed social worker.  In that case, a social worker had been hired to complete a social history of the family.  In her offer of proof, she "testified to four 'observations' that she had made: (1) lack of parental bonding; (2) substance abuse by [the defendant's mother] and at least two of Fulgham's stepfathers; (3) lack of a biological father's input; and (4) the love that Fulgham had for her children and vice versa after three years of incarceration."  (*Id*. at p. 335.)  The state conceded that the witness could be accepted as an expert in the field of social work but then objected to her testifying to any conclusions she had reached or observations she had made after completing her social history, on the grounds that she was a social worker rather than a psychiatrist or psychologist and that everything she would be testifying to would be hearsay. (*Ibid*.)  The Mississippi Supreme Court directly responded to the state's objections, ruling that the state had "presented no argument or evidence that [the] testimony was outside the field of social work. And its objection based on hearsay is unfounded." (*Ibid*.)  It then found the proffered evidence "relevant." (Id., at p. 336.)  Although the trial court had ruled that the social worker's testimony "was not of such a high degree of expertise and skill that it was outside the knowledge of a lay person, and that the jury could arrive at these conclusions based on the evidence already admitted" (*ibid*.), the

Mississippi Supreme Court did not explicitly consider whether relevant mitigating expert evidence could properly be excluded because it was not the proper subject of expert opinion testimony. Accordingly, defendant's reliance on *Fulgham v. State* is misplaced.

As noted above, we have held that "a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citation.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) Applying our standard of review for discretionary determinations, we find no abuse of discretion in the trial court's decision to exclude the expert opinion testimony of Dr. Andrews at the second penalty retrial in this case.

### E. Exclusion of Mitigating Evidence

Defendant contends the trial court violated his right to "have his penalty phase sentencers consider all relevant mitigation evidence" by excluding some of his proffered mitigating evidence. We find no error.

#### 1. *Exclusion of Hearsay Declarations*

Defendant's brother Ronald and defendant's mother, Shirley, died before the second penalty retrial. Prior to their deaths, each had written a declaration in 1991, signed under penalty of perjury. Defendant argues those declarations "detailed significant incidents in [his] childhood that helped explain his adult behavior" by focusing on "the history of daily mental and physical abuse, and exposure to deviant sexual behavior." He claims that "though the declarations were technically hearsay, they were reliable and critical mitigation evidence that

should . . . have been admitted." Defendant relies on his Eighth Amendment right at the penalty phase to have the jury consider all relevant mitigating evidence (*Skipper v. South Carolina* (1986) 476 U.S. 1, 4), as well as his due process right to have hearsay testimony presented at the penalty phase of his capital trial when it is highly relevant to a critical issue and there are substantial reasons to assume its reliability. (*Green v. Georgia* (1979) 442 U.S. 95, 97.)

### a. Applicable Law

"The Eight Amendment to the United States Constitution requires that a capital jury not be precluded from 'considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' [Citation.] Nonetheless, the trial court still ' "determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury." ' [Citation.]" (*People v. Williams* (2006) 40 Cal.4th 287, 320.) "[A] defendant's due process rights are violated when hearsay testimony at the penalty phase of a capital trial is excluded, if both of the following conditions are present: (1) the excluded testimony is 'highly relevant to a critical issue in the punishment phase of the trial,' and (2) there are substantial reasons to assume the reliability of the evidence." (*People v. Kaurish* (1990) 52 Cal.3d 648, 704, quoting *Green v. Georgia*, *supra*, 442 U.S. at p. 97.) However, "neither this court nor the high court has suggested that the rule allowing all relevant mitigating evidence has abrogated the California Evidence Code." (*People v. Edwards* (1991) 54 Cal.3d 787, 837.)

"[I]f the exculpatory value of the excluded evidence is tangential, or cumulative of other evidence admitted at trial, exclusion of the evidence does not

45

deny the accused due process of law." (*People v. Smithey* (1999) 20 Cal.4th 936, 996.) The opportunity for cross-examination is an important factor in determining whether otherwise inadmissible testimony should be admitted to ensure a defendant's right to due process of law. (*Id.* at p. 997, fn. 17; see *People v. Edwards*, *supra*, 54 Cal.3d at p. 838 [defendant has "no right to effectively have someone else testify for him and thereby prevent cross-examination"].)

### b. The Relevant Rulings

Ronald wrote in his signed declaration "in support of [defendant's] habeas corpus petition" in federal court that defendant and his siblings grew up in a "horrible" environment in which their father repeatedly beat them and then beat their mother when she tried to intervene. Ronald also declared, in relevant part, that (1) their father shot a dog while Ronald held its leash and killed mice in front of Ronald by throwing them against their house; (2) their father sexually molested one of his daughters; (3) defendant had sexual relationships with men when he was young and once had been forced to have oral sex with older boys; (4) defendant tried to hang himself when he was seven or eight years old; and (5) defendant drank alcohol and used drugs that made him "act stronger and violent."

The trial court correctly noted that "hearsay evidence must be highly relevant and reliable" to be admissible. In deciding that Ronald's declaration was inadmissible hearsay, the court found that it was not "particularly reliable" because it was written "to get his brother out of . . . prison, get him a new trial" and was therefore "highly susceptible to exaggeration and outright fabrication." The court also based its decision to exclude the declaration on "the fact that it is cumulative" because several witnesses had "testified to the abuse," and because, to the extent the declaration was not cumulative, defendant could "testify to it and be subject to cross-examination." Asked to reconsider its ruling as to portions of

Ronald's declaration, the trial court declined to do so, reiterating that the declaration lacked "trustworthiness because of the motives involved in creating it," cross-examination was lacking as to issues such as the abuse of animals, and much of the declaration had "been covered by the testimony" already presented.

In relevant part, defendant's mother, Shirley, wrote in her signed declaration "in support of [her] son's habeas corpus petition" in federal court that (1) her husband, Charles, Sr., became "mean and violent" shortly after their marriage and beat her frequently; (2) when she quickly became pregnant with defendant, Charles, Sr., beat her during her pregnancy, and neither she nor he "wanted to have a child so early" in their marriage; (3) she had no prenatal care and had not known how to care for defendant when he was a baby; (4) defendant was a "bed-wetter" until about age 16, and Charles, Sr., would pinch defendant's penis or rub his nose in the wet bedding; (5) defendant and his siblings frequently were beaten by Charles, Sr., and she was beaten if she tried to intervene; (6) defendant was a hyperactive child who had problems at school; (7) the children, including defendant, told her their father would kill animals in front of them; (8) she sometimes hit defendant and his siblings; (9) Charles, Sr., was obsessed with religion and beat the children if they complained about going to church or listening to him read the Bible; (10) she was told that two of her brothers had forced defendant to have oral sex with them when he was a child; (11) she had learned that Charles, Sr., was molesting their daughter; and (12) she had found out that defendant was smoking marijuana and using a white powder and that he would act crazy and real tough while on drugs.

In considering whether to exclude Shirley's hearsay declaration, the trial court noted that much of the information contained in it was "covered from other sources" and that the difficulty with other portions of the declaration lay in that the declaration was written "with a particular objective," namely, "to release

47

[defendant] from custody and get him a new trial" while nothing suggested that defendant's mother was "telling the truth." The court added that some statements in the declaration were "double hearsay," such as Shirley's statement that " 'I've been told and I believe that two of my brothers forced [defendant] to have oral sex with them when [defendant] was a young boy.' " When the trial court denied the defense motion to admit the declaration in addition to the reading of Shirley's prior testimony, it announced its willingness to later consider whether segments of the declaration might be admissible if they turned out to contain "significant evidence, not just peripheral evidence," and if the evidence was "not cumulative."

When the defense asked the trial court to reconsider its ruling as to specific statements in Shirley's declaration, the trial court again determined that some of those statements were either irrelevant or cumulative and then reiterated its finding that the entire declaration lacked trustworthiness because it "was prepared obviously by someone else, not by the person who signed it" and was "prepared for a distinct purpose, . . . to establish the grant of a petition for writ of habeas corpus." The prosecutor then offered to stipulate that Shirley was beaten by Charles, Sr., while she was pregnant with defendant, but the defense chose not to offer that single statement from Shirley's declaration.

### 2. *No Violation of Defendant's Constitutional Rights*

As the trial court noted, there was "a tremendous amount of testimony" presented at defendant's penalty retrial regarding the mental and physical abuse defendant suffered as a child. Evidence had been presented through many witnesses, including Shirley's testimony from defendant's 1984 trial, that defendant's father, Charles, Sr., viciously beat his family members, including his wife; Charles, Sr., had sexually molested his daughter; defendant had been exposed to deviant sexual behavior; Shirley lacked parenting skills and had

48

physically abused defendant; and defendant's parents had failed to provide defendant love or affection. The trial court did not abuse its discretion in excluding much of the hearsay statements in Ronald's and Shirley's declarations on the ground that they "would only have served to corroborate other testimony informing the jury of the same or comparable facts." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1178; see also *People v. Smithey*, *supra*, 20 Cal.4th at pp. 996-997 [hearsay mitigating evidence properly excluded as not highly relevant to a critical issue because ample evidence had been admitted on the identical subject]; *People v. Loker* (2008) 44 Cal.4th 691, 729-730 [same].) Nothing in Ronald's declaration suggested that defendant saw or was aware that his father killed animals in front of Ronald. (See *People v. Loker*, *, supra*, 44 Cal.4th at p. 729.) Moreover, evidence of Charles, Sr.'s cruelty to animals would have added little to the extensive testimony describing Charles, Sr.'s cruel and violent behavior towards his family and was merely tangential to defendant's mitigation case. Nothing in the record refutes the trial court's finding that there was no substantial reason to assume the reliability of either Ronald's or Shirley's unsubstantiated remaining hearsay statements that were motivated by a desire to help defendant overturn his conviction and death sentence. We conclude the trial court did not abuse its discretion in excluding the two declarations.

We next review the trial court's decision to exclude testimony from defendant's paternal aunt, Roberta Williams, that defendant's father Charles, Sr., beat his own father.

" ' "[R]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." ' " (*People v. Farley* (2009) 46 Cal.4th 1053, 1128.) The trial court "determines relevancy in the first instance." (*People v. Cain* (1995) 10 Cal.4th 1, 64 (*Cain*).) As noted above, "[a]lthough the Eighth and

Fourteenth Amendments confer a right upon capital defendants to present all relevant mitigating evidence to the jury [citation], the United States Supreme Court never has suggested that this right precludes the state from applying ordinary rules of evidence to determine whether such evidence is admissible." (*People v. Smithey*, *supra*, 20 Cal.4th at p. 995.) The improper exclusion of evidence is subject to a harmless error analysis. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson, supra*, 43 Cal.4th at p. 693.)

The "background of the defendant's family is material if, and to the extent that, it relates to the background of defendant himself." (*People v. Rowland* (1992) 4 Cal.4th 238, 279.) The "background of the defendant's family is of no consequence in and of itself." (*Ibid*., italics omitted.) Here, the trial court properly excluded the proffered testimony from defendant's aunt because defense counsel never argued that defendant was aware of that particular aspect of abuse by his father and never made an offer of proof or an attempt to lay a factual foundation for the view that the abuse of defendant's grandfather had affected defendant. The trial court's decision to exclude this evidence did not constitute an abuse of discretion and did not deprive defendant of his right to present relevant mitigating evidence.

In any event, the excluded testimony would merely have corroborated the testimony from several family members that defendant's father beat everyone in the family. The trial court permitted defendant to present detailed evidence from several witnesses that defendant's father, Charles, Sr., was extraordinarily violent towards his family, including defendant, his mother, and all of his siblings. The corroboration value of the excluded evidence was slight because the prosecutor did not challenge defendant's background evidence that his father was physically violent towards his family members and created an atmosphere of violence and abuse in defendant's household. Accordingly, any error in excluding the

50

testimony was harmless beyond a reasonable doubt as there is no reasonable possibility the error affected the jury's penalty determination. (*Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Watson*, *supra*, 43 Cal.4th at p. 693.)

## F.  Prosecutorial Misconduct

Defendant contends the prosecutor's "three misstatements of law and fact" during closing argument constituted misconduct.  Specifically, he argues his right to due process and his right to have the trier of fact fully consider the mitigation evidence were violated when the prosecutor (1) misstated and oversimplified capital sentencing law; (2) defined "sociopath" for the jury; and (3) included the molestation of defendant's brother Thomas in his list of aggravating crimes.  We find no prejudicial prosecutorial misconduct.

### 1.  *Role of Prior Criminality in a Capital Sentencing Determination*

Defendant contends the prosecutor's closing argument to the jury "incorrectly implied that past criminal conduct was *the* critical factor in determining whether someone was eligible for death sentencing" by presenting a "formula for calculating penalty" that "discounted the moral evaluation" of the evidence.  Defendant additionally argues that the prosecutor improperly urged the jury to focus solely on section 190.3, factor (b) aggravating evidence and incorrectly implied evidence admitted pursuant to factor (b) was necessarily aggravating.  He also claims the prosecutor improperly implied that part of the jury's task was to "mete out punishment for crimes other than Paula's murder."

After noting that defendant had been convicted of first degree murder and two special circumstance allegations had been found to be true, the prosecutor informed the jury that, accordingly, there are "only two choices" at the penalty phase, and that "the absolute minimum sentence" is life without the possibility of

51

parole.  The prosecutor added that "[i]f a defendant, if [defendant] has no history of criminality at all, . . . the minimum sentence that he receives is life without parole.  That's the law in this state."  Defense counsel objected to this statement on the grounds that the prosecutor had misstated the law and had confused the jury, and the trial court overruled this objection.

Shortly thereafter, the prosecutor explained that the jurors would have to "determine punishment" based on the aggravating and mitigating factors, and he reiterated that the minimum sentence defendant faced was life without the possibility of parole.  He told the jurors they would have to "consider what is the punishment for the aggravating criminal conduct," and then stated the following list": "One, the sodomy of Curtis M.  Two, the rape and kidnapping of [Patricia].  Three, the attempted murder of Theodore Sum.  Four, the molestation of Teressa [].  Five, the assaults of Rebecca []."

The prosecutor later asked the jury what should be "the punishment" for the rape of Patricia and for defendant's "conduct in relation to" her.  Discussing the attempted murder of Theodore, the prosecutor asked, "What is the punishment for that crime? . . . Does it aggravate the crime of the killing of [Paula]?  Of course it does."

The People argue defendant forfeited the precise issues he raises regarding a misstatement of our capital sentencing law.  "As a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion— and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety."  (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Here, the prosecutor's statement to which defendant objected asserted only that the minimum sentence would be life without the possibility of parole if defendant had no criminal history.  The objection was properly overruled because

52

that statement correctly explained our state's capital sentencing law. Defendant does not argue otherwise. On appeal defendant contends the prosecutor improperly suggested the appropriate punishment is determined through the mechanical addition of punishment for additional crimes, implied that section 190.3, factor (b) evidence is necessarily aggravating, and urged the jury to focus only on aggravating evidence. Those contentions are not related to the statement to which defendant objected regarding the minimum sentence, and they were not the subject of the trial court's ruling. We conclude defendant has forfeited his appellate claims of prosecutorial misconduct regarding the process for determining punishment by failing to object on those grounds in the trial court and by failing to seek an admonition to cure any harm caused by the alleged misconduct.

Defendant relies on *People v. Hill* (1998) 17 Cal.4th 800 to argue he was excused from objecting or seeking an admonition. His reliance on *Hill* is misplaced because, unlike the circumstances involved in *Hill*, nothing in the present record suggests a timely objection or a request for an admonition would have been futile, that an admonition would not have cured any harm, that defendant did not have the opportunity to raise the necessary objection or to make a request for an admonition, or that a timely objection would have been counterproductive to the defendant. (*Id*. at pp. 820-821.) Nonetheless, we choose to discuss the merits of defendant's claim that the prosecutor misstated the process for determining punishment.

We first address defendant's claim that the prosecutor improperly "suggest[ed] to jurors that burdens of proof are proved by some sort of mechanical calculation," by concocting a "formula" that "conviction + need to punish for other bad acts = death penalty," which "discounted the moral evaluation of all of the evidence" and "suggested the jury's task simply involved a scorecard" in

53

which "consideration of and punishment for other bad acts should be added to the baseline." We disagree.

The prosecutor properly informed the jury that it should consider defendant's criminal history in determining penalty. That argument was consistent with factor (b) of section 190.3, which provides that, "[i]n determining the penalty, the trier of fact shall take into account . . . [¶] . . . [¶] (b) The presence or absence of criminal activity by the defendant. . . . ." In fact, during his argument, the prosecutor quoted the portion of CALJIC No. 8.88 that emphasizes to the jury that "[t]he weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them." He then explicitly told the jurors that they should not just count up the number of aggravating and mitigating factors and determine penalty based on number alone, that they should balance the factors, and that they were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." The prosecutor's challenged statements do not constitute prejudicial misconduct as there is no "reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa*, *supra*, 15 Cal.4th at p. 841.)

We similarly find no merit in defendant's claim that the prosecutor implied the section 190.3, " 'factor (b)' evidence" was "*necessarily* aggravating." The prosecutor did not suggest to the jury that factor (b) evidence never could be mitigating; instead, the prosecutor properly argued that the factor (b) evidence in this case was overwhelmingly aggravating. He then emphasized that the jury could consider the aggravating criminal conduct to "determine punishment" and that other criminal behavior, such as the attempted murder of Theodore Sum, "aggravate[s] the crime of the killing of [Paula]." The prosecutor's argument that

54

evidence of prior activity involving force or violence or threats of force or violence was aggravating in defendant's case did not constitute prosecutorial misconduct. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1155-1156 [prosecutor did not mislead jury regarding nature of evidence admitted pursuant to factor (a) of section 190.3 by emphasizing that such evidence was aggravating in that case].)

Defendant next contends the prosecutor improperly urged the jury to focus on the aggravating evidence "to the exclusion of everything else," and implied that the jury's job was to sentence defendant for Paula's murder and "also to mete out punishment for the other crimes as well." To the extent these claims rest on the assertion that the argument suggested the jury should apply a simple formula in deciding punishment, they lack merit for the reasons stated above. To the extent these claims rest on defendant's claim that the prosecutor's statements were "incorrect," he is wrong. After commenting that if defendant had no criminal history, his minimum sentence in this case would be life without the possibility of parole, the prosecutor told the jurors they had "to consider what is the punishment for the aggravating criminal conduct." The jury was entitled to consider defendant's prior criminal activity in determining the appropriate punishment for Paula's murder. (§ 190.3, factor (b).) In context, the prosecutor told the jury that defendant's prior criminal activity made him more deserving of the death penalty in the present case. "[E]vidence of violent crimes is expressly made admissible by factor (b) of section 190.3" (*People v. Davenport* (1995) 11 Cal.4th 1171, 1205), and the prosecutor did not commit misconduct by emphasizing the admissible evidence of prior criminality on the issue of punishment. (*Id.* at p. 1214.)

In any event, the trial court's instructions rendered any conceivable misconduct harmless. Arguments by counsel "generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, [citation], and are likely viewed

55

as the statements of advocates; the latter, . . . are viewed as definitive and binding statements of the law." (*Boyde v. California* (1990) 494 U.S. 370, 384; see also *People v. Mendoza* (2007) 42 Cal.4th 686, 703.) Here, the trial court explained that it was instructing the jury as to "all of the law that applied to the penalty phase of this trial." It then provided the jury with the correct standard for how to evaluate the aggravating and mitigating factors pursuant to CALJIC Nos. 8.85, 8.86, 8.87, and 8.88, and it instructed the jury that it "must accept and follow the law that I shall state to you." (CALJIC No. 8.84.1.) There was no reasonable possibility the prosecutor's challenged statements affected the jury's penalty determination. (*People v. Bonin* (1988) 46 Cal.3d 659, 702, overruled on other grounds in *People v. Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1 [prosecutor's misstatement regarding aggravating and mitigating factors neutralized by trial court's instructing jurors to accept and follow the rules of law as stated by it].)

### 2. Definition of "Sociopath"

During the penalty retrial, evidence was presented that a court psychiatrist diagnosed defendant as having a "character disorder, sociopathic." Over objection, the prosecutor was permitted during argument to tell the jury that the term "sociopath" means someone who has "an anti-social personality behavior . . . that violates the rights of others or criminal behavior, a disease against society." Defendant contends the prosecutor committed misconduct by becoming "his own psychiatric expert witness."

In *People v. Friend* (2009) 47 Cal.4th 1, this court concluded a prosecutor was using "language in common currency to describe his interpretation of the evidence, not improperly stating an expert opinion" when he argued the defendant had " 'an antisocial personality' " and "was a 'sociopath,' 'without feeling.' " (*Id.* at p. 84.)

56

Here, even assuming the phrase "a disease against society" is not part of the definition of sociopath, but a comment on a sociopath's effect on society, the prosecutor did not commit misconduct by using this "descriptive comment." (*People v. Williams* (1997) 16 Cal.4th 153, 221.) The court psychiatrist had diagnosed defendant as a sociopath, the definition the prosecutor provided of the term was reasonably correct (see *People v. Zambrano* (2007) 41 Cal.4th 1082, 1173 [noting that a "sociopath" is "someone who acts without conscience or remorse"]), and there is no indication in the record that the jury construed or applied the challenged definition in an objectionable manner (*People v. Valdez* (2004) 32 Cal.4th 73, 132-133).

We conclude the challenged definition did not deny defendant his right to a fair trial, and that there is no reasonable possibility that it influenced the penalty verdict. Accordingly, any misconduct was harmless under both federal and state law. (*United States v. Agurs* (1976) 427 U.S. 97, 108; *People v. Ervine* (2009) 47 Cal.4th 745, 805-806.)

### 3. *Reference to the Molestation of Thomas*

Defendant's brother Thomas testified, without objection, that when he was a teenager, defendant once coerced him into engaging in anal and oral sex. As previously noted, a jury, in determining penalty, must take into account, if relevant, "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) In this case, the trial court ruled that the "coercion" involved in the molestation of Thomas did not constitute a threat of force or violence and that, therefore, the molestation did not qualify as criminal activity that the jury could take into account as an aggravating factor within the meaning of section 190.3, factor (b). Defendant contends the

prosecutor committed misconduct when he included, in a list of defendant's criminal acts for the jury to consider in determining punishment, the "testimony . . . that the defendant molested his brother."

Defendant forfeited a claim of misconduct based on this brief reference to defendant's molestation of his brother, in an extensive list of aggravating factors, by failing to request a curative instruction at the time the trial court told the prosecutor that "it sounded like you were making an aggravating circumstance out of Tommy McDowell's sexual encounter," and by later telling the trial court that the defense did not want the court to do anything about the molestation comment beyond explaining in its instructions the aggravating factors in defendant's case. By failing to request an admonition or other corrective action, under circumstances where such an instruction or other corrective action might well have cured any prejudice caused by the misconduct, defendant failed to preserve this issue for appeal. (*People v. Ledesma* (2008) 39 Cal.4th 641, 740.)

In any event, any error regarding the reference to the molestation of Thomas was harmless. After that reference, the trial court instructed the jury on the applicable aggravating factors, and the molestation of Thomas was not included in that list. The jury then was instructed that any other evidence it had heard about defendant's "character and past behavior, no matter how reprehensible or offensive . . . , cannot be used as aggravation . . . for imposing the death penalty." (See CALJIC No. 8.85.) In light of these instructions, we conclude there is no "reasonable likelihood" the jurors believed the molestation of Thomas could be used as an aggravating factor. (*People v. Samayoa*, *supra*, 15 Cal.4th at p. 841.)

For the reasons stated above, we find no merit in defendant's claim that the three instances of alleged prosecutorial misconduct violated his due process right

58

to a fair trial or interfered with the jury's ability to fully consider his mitigation evidence.

### 4. *Cumulative Misconduct*

Defendant contends the prosecutorial misconduct in his case, when "measured cumulatively," requires a reversal of the death penalty judgment. Much of the conduct about which defendant complains was proper, and we conclude any prosecutorial misconduct that did occur, even when measured cumulatively, was not prejudicial for the reasons stated above. Defendant's suggestion to the contrary, the fact that the prosecutor did not make the challenged statements in the first penalty retrial, in which the jury could not reach a decision on punishment, does not establish prejudice. (See, e.g., *People v. Saddler* (1979) 24 Cal.3d 671, 684 [instructional error harmless although prior trial in which the instruction was not given resulted in a hung jury].)

### G. Instructions on Unadjudicated Offenses

Over objection, the trial court instructed the jury on all of the elements of defendant's prior criminal activity admitted under section 190.3, and it instructed on motive and flight after the commission of a crime as relevant to defendant's prior criminal activity. Defendant contends the court erred. We disagree.

Although defense counsel stated that defendant was conceding he had committed the prior offenses and would stipulate to the elements of those crimes, the prosecutor requested instructions on the elements of defendant's prior crimes. Defense counsel objected, arguing that because "there's going to be no issue that they were committed, the instructions would "unfair[ly]" "emphasize[] those incidents." The trial court recognized that appellate cases have held it is unnecessary to instruct on the elements of the prior crimes unless requested. The court instructed on the elements of the prior crimes, both because the prosecutor

59

requested the instructions and because it believed the jury needed to know what the elements were, as it had "to find these offenses beyond a reasonable doubt." Accordingly, in both the first and second penalty retrials, the trial court instructed the jury on the elements of sodomy and rape and gave additional related instructions on general intent, motive, and flight.

"[I]f a defendant — or the prosecution — requests an instruction" on the elements of defendant's alleged prior crimes, "they are *entitled* to have the jury informed of the elements of the alleged other crimes." (*People v. Phillips* (1985) 41 Cal.3d 29, 72, fn. 25, italics added (*Phillips*); see also *Cain*, *supra*, 10 Cal.4th at p. 72 ["there is no duty, absent a request, to instruct on elements of crimes proven under factor (b)" of § 190.3].) Defendant's characterization of the above statement in *Phillips* as a "suggestion that trial courts could instruct on the elements of the crimes" ignores our use of the word "entitled."

The fact that defendant offered to stipulate that the prior crimes occurred did not eliminate the prosecutor's right to have the jury instructed on the elements of those crimes. (*Phillips*, *supra*, 41 Cal.3d at p. 72, fn. 25.) Our statement in *Cain* that a trial court is not prohibited from giving instructions on the elements of unadjudicated crimes "on its own motion when they are 'vital to a proper consideration of the evidence" (*Cain*, *supra*, 10 Cal.4th at p. 72) is irrelevant in this case because the prosecutor requested the challenged instructions and the trial court appropriately granted that request.

Defendant accuses the trial court of (1) "loathing" him and basing its rulings on its personal desire to see defendant executed, (2) instructing on the elements of the alleged other crimes because it was afraid the jury would not hear enough aggravating evidence to sentence defendant to death, and (3) so instructing because it was united with the prosecutor in making certain that defendant was sentenced to death, as shown by its occasional use of the pronoun "we." These

60

accusations all fail in the context of defendant's claim that the trial court should not have instructed on the elements of his alleged prior criminal activity because the trial court's ruling correctly recognized that our holding in *Phillips* entitled the prosecutor to request the challenged instructions.

The claim that the instructions on the elements of alleged prior criminal activity violated defendant's Fifth, Sixth, Eighth, and Fourteenth Amendment rights fails here, where substantial evidence of those prior crimes was properly admitted. (*People v. Zambrano*, *supra*, 41 Cal.4th at p. 1182, fn. 39; *People v. Memro* (1995) 11 Cal.4th 786, 881.)

## H.  Cumulative Error During Second Penalty Retrial

Defendant contends the "cumulative effect of the trial court's errors absolutely demands" a reversal of the judgment. This contention lacks merit. When considered individually or collectively, the few errors that occurred during defendant's second penalty retrial were harmless. He was entitled to a fair trial but not a perfect one. (*People v. Cunningham* (2008) 25 Cal.4th 926, 1009.)

## I.  Instructional and Constitutional Challenges to California's Death Penalty Statute

Defendant challenges various features of California's death penalty law and related standard jury instructions. We have rejected each of those challenges in the past. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 208-209; *People v. Schmeck* (2005) 37 Cal.4th 240, 303-304.) We affirm our prior holdings.

The statutory special circumstances that qualify a defendant for the death penalty (§ 190.2) are not unconstitutionally overbroad. (*People v. Lee* (2011) 51 Cal.4th 620, 653; *People v. Verdugo* (2010) 50 Cal.4th 263, 304; *People v. Harris* (2005) 37 Cal.4th 310, 365.)

California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty.

(*People v. Gamache* (2010) 48 Cal.4th 347, 406; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1058.)

Factor (a) of section 190.3, which permits the jury to consider "[t]he circumstances of the crime" in deciding whether to impose the death penalty, does not license the arbitrary or capricious imposition of the death penalty. (*People v. Brady* (2010) 50 Cal.4th 547, 590; *People v. Cook* (2007) 40 Cal.4th 1134, 1366; see also *Tuilaepa v. California* (1994) 512 U.S. 967, 974-980.)

The death penalty statute is not unconstitutional because it does not require "findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Lynch* (2010) 50 Cal.4th 693, 766.) Nothing in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects that conclusion. (*People v. Thomas* (2011) 51 Cal.4th 449, 506; *People v. Smith* (2007) 40 Cal.4th 483, 526.) No burden of proof is constitutionally required, nor is the trial court required to instruct the jury that there is no burden of proof. (*People v. Taylor* (2009) 47 Cal.4th 850, 899; *People v. Bennett* (2009) 45 Cal.4th 577, 632.) That certain noncapital sentencing proceedings may assign a burden of proof to the prosecutor does not mean the death penalty statute violates a defendant's rights to equal protection or due process. (*People v. Rogers* (2006) 39 Cal.4th 826, 893.)

The "so substantial" language in the penalty phase instructions is not impermissibly vague or ambiguous. (*People v. Schmeck*, *supra*, 37 Cal.4th at p. 305; *People v. Boyette*, *supra*, 29 Cal.4th at p. 465; *People v. Breaux* (1991) 1 Cal.4th 281, 316, fn. 14.)

CALJIC No. 8.88 does not improperly fail to inform the jury that the central determination is whether death is the "appropriate punishment." The instruction properly explains to the jury that it may return a death verdict if the aggravating evidence "warrants" death. (*People v. Mendoza*, *supra*, 42 Cal.4th at p. 707; *People v. Arias* (1996) 13 Cal.4th 92, 171.)

CALJIC No. 8.88 does not improperly fail to inform the jurors they are required to return a sentence of life without the possibility of parole if they determine that mitigation outweighs aggravation. (*People v. McWhorte*r (2009) 47 Cal.4th 318, 379.)

The jury is not required to make written findings as to which aggravating factors it relied upon in imposing the death penalty. (*People v. Cook*, *supra*, 39 Cal.4th at p. 619.)

The use of restrictive adjectives, such as "extreme" and "substantial" in the list of mitigating factors (§ 190.3), "does not act unconstitutionally as a barrier to the consideration of mitigation." (*People v. Hoyos* (2007) 41 Cal.4th 872, 927.)

The trial court is not required to delete inapplicable sentencing factors from CALJIC No. 8.85. (*People v. Stanley* (1995) 10 Cal.4th 764, 842.)

Neither the federal nor our state Constitution requires intercase proportionality review. (*People v. Jablonski* (2006) 37 Cal.4th 774, 837.)

Equal protection principles do not require our court to give capital defendants the same sentence review that is afforded other felons under the determinate sentencing law. (*People v. Cox* (2003) 30 Cal.4th 916, 970.)

A sentence of death that complies with state and federal constitutional and statutory requirements does not violate international law. (*People v. Lewis* (2008) 43 Cal.4th 415, 539.)

63

## III. CONCLUSION

The judgment is affirmed.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CORRIGAN, J.**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. McDowell, Jr.

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S085578
**Date Filed:** June 25, 2012

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** William R. Pounders

_____

**Counsel:**

Tamara P. Holland, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Jonathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Tamara P. Holland
769 Center Boulevard, #132
Fairfax, CA  94930
415) 488-4849

Jonathan J. Kline
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 576-1341