Filed 8/22/14  P. v. Heuser CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>RONALD JAMES HEUSER,<br><br>        Defendant and Appellant. | C071598<br><br>(Super. Ct. Nos. SF10027, SF10165) |

In case No. SF10-027, defendant Ronald James Heuser was convicted by jury of possession of a deadly weapon (a meat cleaver), possession of a firearm by a convicted felon, and possession of ammunition by a convicted felon.  In a bifurcated proceeding, the trial court found true allegations defendant was previously convicted of two strike offenses within the meaning of the three strikes law.  (Pen. Code, §§ 1170.12, subds. (a)-(d) & 667, subds. (b)-(i).)[1]  The trial court struck one of the prior strikes (see *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497) and sentenced defendant to serve an

---

[1]     Undesignated statutory references are to the Penal Code.

1

aggregate term of seven years four months in state prison (six years (upper term of three years, doubled pursuant to the three strikes law) for possession of the meat cleaver, plus one year four months (one-third the middle term, doubled) for possession of the firearm; sentence for possession of ammunition was stayed pursuant to section 654).

In case No. SF10-165, defendant was convicted by jury of transportation of methamphetamine, possession of methamphetamine for sale, and resisting a peace officer.[2]  In a bifurcated proceeding, the jury found true allegations defendant had three prior narcotics convictions within the meaning of Health and Safety Code section 11370.2.  The trial court confirmed the sentence previously imposed in case No. SF10-027 and added a subordinate term of four years eight months (one year for transportation of methamphetamine, plus eight months for possession of methamphetamine for sale (one-third the middle term for each offense), plus a three-year enhancement term for one prior narcotics conviction (the remaining two enhancement terms were "stayed" pursuant

---

[2]     Effective January 1, 2014, Health and Safety Code section 11379, defining the crime of transportation, was amended to provide that " 'transport' means to transport for sale." (Health & Saf. Code, § 11379, subd. (c); Stats. 2013, ch. 504, § 2.)  While this amendment applies retroactively to defendant's transportation conviction (*In re Estrada* (1965) 63 Cal.2d 740, 744, 748 [where an amended statute mitigating punishment has no saving clause and takes effect before the judgment of conviction becomes final, "the rule is that the amendment will operate retroactively so that the lighter punishment is imposed"]; *People v. Vinson* (2011) 193 Cal.App.4th 1190, 1197-1199 [the rule articulated in *Estrada* applies to amendments that add to the elements of a crime]), it does not require reversal of this conviction because the jury found defendant guilty of possession of methamphetamine for sale.  Thus, the newly-added "for sale" element, already an element of possession for sale, was pled and proved beyond a reasonable doubt.  (See *People v. Montero* (2007) 155 Cal.App.4th 1170, 1175 [intent to sell is an element of the crime of possession for sale]; *People v. Vinson*, *supra*, 193 Cal.App.4th at pp. 1200-1201 [while amended section 666, requiring three prior theft-related convictions and three periods of incarceration, applied retroactively to the defendant's conviction, reversal not required where two such convictions and periods of incarceration were pled and proved as section 667.5, subdivision (b), enhancements and a third was established by stipulation at trial].)

to section 1385); sentence for resisting a peace officer was deemed served), for an aggregate prison term of 12 years.

On appeal, with respect to case No. SF10-027, defendant contends the prosecutor committed prejudicial misconduct by (a) violating an in limine ruling restricting his ability to impeach defendant with specific prior convictions, "especially with respect to [two prior weapon-related convictions] which are similar in nature" to the charged offenses, (b) impeaching defendant with prior weapon-related arrests and prosecutions, and (c) stating during closing argument the jury could "consider the fact that on other occasions [defendant] possessed weapons" and "acknowledged being previously arrested for other weapons cases and other weapons violations." Acknowledging defense counsel did not object to the prosecutor's conduct, thereby forfeiting the claim of prosecutorial misconduct, defendant argues reversal is nevertheless warranted because counsel's failure to object amounted to constitutionally deficient performance and resulted in prejudice. With respect to case No. SF10-165, defendant asserts two sentencing errors: (1) the judgment must be modified to stay execution of the sentences imposed for (a) possession of methamphetamine for sale and (b) the prior narcotics conviction enhancement; and (2) the judgment must be further modified to strike the two prior narcotics conviction enhancements the trial court improperly "stayed" pursuant to section 1385.

We modify the judgment and affirm. As we explain, in case No. SF10-027, defendant's prosecutorial misconduct claim is forfeited because defendant did not object to the alleged misconduct or request a curative admonition. Assuming defense counsel's failure to object and request such an admonition fell below an objective standard of reasonableness, defendant has not carried his burden of demonstrating a more favorable outcome is reasonably probable absent counsel's omissions. In case No. SF10-165, we conclude the sentence imposed for transportation of methamphetamine must be stayed

3

pursuant to section 654 and the two prior narcotics conviction enhancements must be stricken pursuant to section 1385.

## FACTS[3]

On January 28, 2010, defendant was driving southbound on Indian Springs Road in Penn Valley. He was returning to Carl Fiesel's property after running an errand. Fiesel's daughter, Becky, was in the passenger seat. A short distance from the property, Deputy Jeff Martin of the Nevada County Sheriff's Department initiated a traffic stop. Instead of pulling to the right shoulder, defendant continued to Fiesel's property and pulled into the driveway on the left side of the road. After driving about 60 feet down the driveway, defendant made a three point turn and parked his car near Fiesel's truck, facing Deputy Martin's patrol vehicle. When defendant's car came to a stop, Becky got out and ran to her father's mobile home. She appeared to be "extremely upset and agitated." Martin, who was now standing outside his vehicle, directed her to get back in the car, but she did not comply.

Deputy Martin then ordered defendant to get out of the car. Defendant yelled to Martin through an open window, demanding an explanation for the traffic stop. Several times, Martin ordered defendant to show his hands and step out of the car. Eventually, defendant got out of the car and walked over to Fiesel's truck. Martin approached defendant and explained he would be conducting a pat-down search for weapons. Defendant indicated he would comply, but when Martin placed his hand on defendant's wrist, defendant "immediately pulled away and retreated back towards his vehicle." Martin called for backup and followed in pursuit. As defendant reached the car, Martin "grabbed onto him and closed the door and pushed him past his vehicle to prevent him

---

[3]    Because defendant raises only sentencing errors with respect to case No. SF10-165, we do not recite the facts of that case.

from accessing any of the doors." Martin repeatedly ordered defendant to stop and followed defendant as he circled back around to Fiesel's truck. At the truck, Martin warned defendant he would be hit with a baton or pepper-sprayed if he did not keep his hands where Martin could see them. Defendant turned away from Martin, who then sprayed him in the face with pepper spray and tried to take him into custody. Defendant resisted, "slipped out of a leather vest that he was wearing and swung it at [Martin] as [the deputy] backed up." At this point, another deputy arrived on the scene. After Martin told the second deputy to use his taser, defendant lay down on the ground and was taken into custody without further incident.

Deputy Martin first searched the vest defendant threw at him, finding a small black bag containing 24 unfired .22-caliber rounds of ammunition. Martin then searched defendant's car and found a meat cleaver between the driver's seat and the center console and a loaded .22-caliber revolver beneath the driver's seat. On the scene, defendant twice yelled that the handgun belonged to him and he bought it for protection, elaborating he "received threats against his life down in Marysville." Later, at the hospital where defendant was treated for exposure to pepper spray, he told Martin "he bought the firearm off the street for 50 dollars so he could protect himself."

Defendant testified in his own defense. According to defendant, as he approached Fiesel's property with Becky in the passenger seat, he saw "bright lights" and "somebody driving up really fast" behind them, but did not know he was being pulled over because there were no "flashing lights." Defendant pulled into Fiesel's driveway, turned around, and parked on the property. As he did so, the approaching vehicle came "screeching up" the driveway with its high-beam headlights on and stopped in front of defendant's car. Defendant and Becky sat in the car for "a few minutes" asking each other who could be in the other vehicle. Defendant "couldn't tell what kind of vehicle it was" until Deputy Martin got out and defendant saw the Sheriff's Department decal on the driver's door. At

5

this point, defendant told Becky: "You better go tell your father that the police are here on the property." Becky got out of the car and ran to her father's mobile home. Defendant then rolled down the window and told Martin: "[T]his is private property. You're trespassing." Martin responded: "Get out of the car and let me see your hands." Defendant complied. He was holding his cell phone. When Martin ordered defendant to put his hands in the air, defendant responded: "I'm going to record this on a video." Martin asked defendant to produce identification and then "rushed [him] to grab the phone."

A "scuffle" ensued, during which defendant told Deputy Martin: "[Y]ou should be calling your backup. You should wait for backup." Unable to take defendant into custody, Martin went back to his patrol vehicle and turned the emergency lights on for the first time. He apparently also called for backup, although defendant did not hear him do so. Martin then resumed his attempt to take defendant into custody on his own. As defendant stood next to Fiesel's truck, Martin sprayed him in the face with pepper spray. The pepper spray "put [defendant] in a real bad state." He took off his jacket and leather vest, wiped off his face, and threw them on the ground, saying to Martin: "What did you do that for?" At this point, the second deputy arrived on the scene and defendant was taken into custody.

Defendant admitted to being a convicted felon. With respect to the handgun and ammunition in his possession at the time of his arrest, defendant testified he bought them for protection. He explained that about two weeks earlier, he reported to Child Protective Services that his daughter had accused a certain individual of sexual abuse. The night before he was pulled over by Deputy Martin, someone fired two shots at him while he stood in front of his house. The following day, defendant bought the handgun and ammunition. According to defendant, the handgun and ammunition were in the trunk of the car when he was pulled over. Defendant also testified the meat cleaver was in the

6

trunk of the car. He bought the cleaver for his mother the previous weekend and forgot it was in the trunk.

Defendant also called two defense witnesses. The first was Carlos Medina, who was at defendant's house the night defendant claimed to have been fired upon. While Medina did not hear any gun shots, he confirmed defendant ran into the house and said, "somebody's triggering me." Defendant "was really agitated." Medina believed this was two days before defendant was arrested in this case. The second was Fiesel, who confirmed defendant ran an errand for him the night he was arrested, taking Becky with him, and Becky ran into the mobile home when they returned and said, "there's a cop right there." Fiesel also testified he saw Deputy Martin's vehicle enter his property and the "red and blue lights" were turned on as Martin pulled into the driveway. Fiesel immediately went out to his truck with his daughter and stood leaning against the seat while Becky stood next to him. However, despite being in a position to see the entire altercation between defendant and Martin, Fiesel offered no testimony regarding the incident.

## DISCUSSION

## I

### *Case No. SF10-027*

Defendant's claim of prosecutorial misconduct is forfeited because he did not object to the prosecutor's alleged misconduct and request a curative admonition. (*People v. McDowell* (2012) 54 Cal.4th 395, 436.) Anticipating forfeiture, defendant argues reversal is nevertheless required because defense counsel's failure to object and request such an admonition amounted to ineffective assistance of counsel. Assuming counsel's performance fell below an objective standard of reasonableness, defendant has not carried his burden of demonstrating a more favorable outcome is reasonably probable absent counsel's omissions.

7

## A.

### *Additional Background*

During a hearing on the prosecution's motion to impeach defendant with prior convictions in the event he testified, defense counsel stated: "I'm aware that my client has, you know, a record. And so he does have some convictions that I believe would be proper to use if they were to be sanitized. I'm going to ask the court because they're so similar to limit it to one conviction and indicate that he has multiple convictions. So, in other words, if my client takes the stand, I would propose that the [prosecutor] could ask him about whether or not he has prior felony convictions involving moral turpitude. He could also ask whether he has multiple convictions involving a particular crime that has been found to involve moral turpitude. But unless my client denies those two things, he would be precluded from going into further details." The trial court agreed that was "the general rule" and asked the prosecutor to address the sanitation issue. The prosecutor also agreed "sanitation is appropriate" for purposes of impeachment, but argued: "[A]t the point at which they proffer some kind of self-defense defense, I think I get to revisit this issue."

The trial court ruled defendant could be impeached with a number of his prior convictions, with the following qualifications: "I think doing it along the lines of asking him if he has prior convictions involving moral turpitude; if he doesn't deny that, I think there doesn't seem to be a need to go into it in further detail, especially with respect to [two weapon-related convictions] which are similar in nature. The other ones were drug sales, I believe, and manufacturing. [¶] With respect to whether or not you get to go into further details with respect to the specifics . . . that's an issue for another argument. I think once we know if the defendant is putting on a case and what that case looks like, and then you can re-raise that issue. And we'll address it at that time." The prosecutor responded: "Sure. And just so I'm not playing hide the ball, I think if there's a proffered

8

self-defense claim to the gun possession, where it gets particularly probative is the fact that there are prior gun prosecutions and especially prior gun prosecutions contemporaneous with drug prosecutions." The trial court replied: "Correct. And I know [defense counsel] has arguments in that regard as well." Defense counsel stated: "Yes." The trial court concluded: "And we'll certainly address those at a later date."

The following exchange took place during the prosecutor's cross-examination of defendant:

"Q.    [Defense counsel] asked you about your prior convictions. You actually have several moral turpitude felony convictions in your past, don't you, sir? Several?

"A.    Yes.

"Q.    And I think three times you've previously been prosecuted for felony weapons violations; is that correct, sir?

"A.    I'm not sure.

"Q.    Well, were you prosecuted once for felony weapons violations out of Contra Costa County?

"A.    Yes, I was.

"Q.    Were you prosecuted once for felony weapons violations out of Placer County?

"A.    Not to my knowledge.

"Q.    Never for weapons violations out of Placer County?

"A.    I thought I was --

"Q.    Perhaps with other charges?

"A.    Yes.

"Q.    And ever prosecuted for weapons violations out of Yuba County?

"A.    No.

"Q.    Or Sutter County?

"A.    I don't recall the Sutter County."

Following a brief change of subject, the prosecutor continued with this line of questioning: "Okay. Going back to my prior questions regarding your histories. You don't recall in May 2002 being arrested and prosecuted out of Yuba County for weapons violations?" Defense counsel interjected: "Is that a charge or a conviction?" The prosecutor responded: "I think I'm entitled to ask him about conduct. So [defense counsel's] concern in my opinion is moot." Defense counsel replied: "Well, then I'll object as unclear. The question is unclear and confusing." After the trial court sustained the objection, the prosecutor asked: "Were you arrested in May 2002 for weapons violations?" Defendant answered: "No."

During the prosecutor's closing argument, he urged the jury to "consider the fact that on other occasions the defendant's possessed weapons not under circumstances supporting a claim of self-defense" and "acknowledged being previously arrested for other weapons cases and other weapons violations."

Following the jury's verdict, defendant (now represented by a new attorney) moved for a new trial and argued, among other things, (1) the prosecutor engaged in misconduct during his cross-examination of defendant, and (2) defense counsel rendered constitutionally deficient assistance by failing to object to the prosecutor's improper cross-examination. Trial counsel submitted a declaration in response to the new trial motion in which he explained his decision not to object to the prosecutor's cross-examination of defendant: "It is correct that the prosecutor overstepped. I chose not to object at that time because the jury had been admonished about convictions versus charges, and I objected early-on in the testimony, and argued the point again to the jury asking them to consider only the present facts. As admitted by [defendant], there is an extensive record of conviction that was kept away from the jury as a result of my

10

argument . . . , and the [trial court] also allowed us to present the necessity defense as well."**4** The new trial motion was denied.

## B.

### *Analysis*

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.,* quoting *United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.)

---

**4** It is unclear to us what defense counsel meant by having "objected early-on in the testimony." The record reveals no objection to the prosecutor's questioning regarding defendant's prior weapon-related convictions and arrests, except for asking that the prosecutor clarify whether he was referring to charges or convictions.

11

While we agree, as defendant's trial counsel put it, "the prosecutor overstepped," defendant has not carried his burden of demonstrating a reasonable probability that, but for counsel's failure to object and request a curative admonition regarding the prosecutor's cross-examination of defendant and statements made during closing argument, the result of the proceeding would have been different.[5] For the following reasons, our confidence in the outcome remains unshaken.

Defendant admitted to being a convicted felon in possession of the handgun and ammunition, but claimed the defense of necessity. Even had the jury believed his testimony in its entirety, this defense fails as a matter of law. For the defense to apply, defendant must have "violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he [or she] did not substantially contribute to the emergency." (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035.) "By definition, the necessity defense is founded upon public policy and provides a justification distinct from the elements required to prove the crime. [Citation.] The situation presented to the defendant must be of an emergency nature, threatening physical harm, and lacking an alternative, legal course of action. [Citation.] The defense involves a determination that the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged. [Citation.] Necessity does not negate any element of the crime, but represents a public policy decision not to punish such an individual despite proof of the crime. [Citations.]" (*People v. Heath* (1989) 207 Cal.App.3d 892, 900-901.)

---

[5] This conclusion makes it unnecessary to determine whether or not the failure to object and request such an admonition fell below an objective standard of reasonableness under prevailing professional norms.

12

Viewing the evidence in the light most favorable to defendant, he had an adequate alternative to buying a handgun and ammunition for protection and keeping these items in the trunk of his car. He could have sought protection from law enforcement. Moreover, when defendant bought the firearm and ammunition, the immediate need for the weapon, i.e., the shooting incident at his house, had passed. Thus, there was no longer an emergency situation. Finally, by keeping a handgun and ammunition in his car, available for use in the event of any future altercation, defendant created a greater danger than the one sought to be avoided. "As a matter of public policy, the Legislature has made it a crime for convicted felons to possess firearms. [Citation.] The purpose of this law is to protect public welfare by precluding the possession of guns by those who are more likely to use them for improper purposes. [Citation.] Due to the potential for death or great bodily injury from the improper use of firearms, public policy generally abhors even momentary possession of guns by convicted felons who, the Legislature has found, are more likely to misuse them." (*People v. Pepper*, *supra*, 41 Cal.App.4th at pp. 1037-1038.)

With respect to defendant's conviction for possession of a deadly weapon, i.e., the meat cleaver, his defense was that he bought the cleaver for the innocent purpose of giving it to his mother and forgot he had left it in his trunk. This defense does not fail as a matter of law. (See *People v. Fannin* (2001) 91 Cal.App.4th 1399, 1404 ["if the object is not a weapon per se, but an instrument with ordinary innocent uses, the prosecution must prove that the object was possessed *as a weapon*"].) The jury simply did not believe defendant's explanation for possessing the cleaver. This is not surprising given defendant's version of the traffic stop is inherently implausible. Moreover, despite Fiesel's presence outside the mobile home during the entire altercation between defendant and Deputy Martin, he offered no testimony to corroborate defendant's version of events. Indeed, the brief testimony Fiesel did offer contradicted defendant's

13

testimony. Defendant testified Martin came up the driveway at a high rate of speed, pulled up in front of defendant's car with the high-beam headlights on, and then waited "a few minutes" before getting out of his vehicle. According to defendant, Martin did not turn on his emergency lights until after the first scuffle and before the pepper spray was used. Fiesel, however, testified the "red and blue lights" were turned on as Martin pulled into the driveway. Thus, defendant's own witness contradicted his testimony. And the jury would reasonably have questioned why Fiesel did not provide any account of the altercation between defendant and Martin unless this would also have contradicted defendant's version of events. (See *People v. Redmond* (1981) 29 Cal.3d 904, 911 ["entirely proper for a jury, during its deliberations, to consider logical gaps in the defense case"].) The jury was also properly informed defendant had multiple felony convictions, which weighed against his credibility.

In short, while the prosecutor improperly elicited the fact two of defendant's convictions were for felony weapons violations, and insinuated defendant was arrested for similar crimes on two other occasions, we conclude there is no reasonable probability the jury's assessment of defendant's credibility would have changed had defense counsel successfully objected to the improper questions posed during cross-examination and statements made during closing argument.

## II

### *Case No. SF10-165*

Defendant's claims of sentencing error have merit, although we disagree with his proposed remedy.

### A.

### *Section 654*

Defendant was sentenced to serve a term of four years eight months for the crimes committed in case No. SF10-165 (subordinate to the term already imposed in case

14

No. SF10-027), calculated as follows:  one year for transportation of methamphetamine, plus eight months for possession of methamphetamine for sale (one-third the middle term for each offense), plus a three-year enhancement term for one prior narcotics conviction. Defendant claims section 654 required the trial court to stay execution of the eight-month sentence imposed for possession of methamphetamine for sale and the attached three-year prior narcotics conviction enhancement, leaving an executed sentence of one year for this case.  The Attorney General agrees section 654 applies, but argues the trial court should have stayed execution of the one-year sentence for transportation of methamphetamine, leaving an executed sentence of three years eight months.  We agree with the Attorney General.

Section 654 provides in relevant part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)

This section "prohibits punishment for two crimes arising from a single indivisible course of conduct.  [Citation.]  If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once.  [Citation.]  If, however, a defendant had several independent criminal objectives, he [or she] may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct.  [Citation.]  The defendant's intent and objective are factual questions for the trial court, and we will uphold its ruling on these matters if it is supported by substantial evidence.  [Citation.]"  (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525; *People v. Correa* (2012) 54 Cal.4th 331, 341.)

Defendant argues, and the Attorney General concedes, "there is insufficient evidence to support the implied finding by the trial court that [defendant] harbored

separate criminal intents and objectives with regards to the transportation and possession of methamphetamine charges. It is undisputed that the only methamphetamine recovered was found on [defendant's] person. There was not any additional methamphetamine found in [defendant's] vehicle at the time of the traffic stop or found anywhere else in this case." We agree. The evidence shows the possession and transportation offenses arose out of the same indivisible course of conduct and were incident to the same objective. (See *People v. Avalos* (1996) 47 Cal.App.4th 1569, 1583 [possession for sale and transportation of methamphetamine not separately punishable].) Thus, defendant must be "punished under the provision that provides for the longest potential term of imprisonment," but not both. (§ 654, subd. (a).)

But this is where our agreement with defendant ends. According to defendant, "[b]ecause the one-year term imposed [for transportation] was the longer term of punishment, the eight-month term imposed [for possession for sale] should have been stayed under section 654." He then argues that if "the sentence for [possession for sale] is stayed under section 654, no punishment is imposed, and as a corollary, [he] may not be punished for the enhancement to that underlying offense," i.e., the three-year prior narcotics conviction enhancement. (See *People v. Smith* (1985) 163 Cal.App.3d 908, 914.) We disagree section 654 requires defendant be given such a windfall. "The purpose of section 654 is to ensure that a defendant's punishment is commensurate with his [or her] culpability and that he [or she] is not punished more than once for what is essentially one criminal act. [Citation.] Courts have devised various rules for proper application of section 654, but '[b]ecause of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an "act or omission," there can be no universal construction which directs the proper application of section 654 in every instance.' [Citation.]" (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1252.) In these circumstances, the provision providing for the longest potential

16

term of imprisonment is the enhancement provision, which is attached to the sentence imposed for possession for sale. Accordingly, the trial court should have stayed execution of the one-year sentence imposed for transportation. We modify the judgment accordingly.

## B.

### *Section 1385*

Finally, defendant argues the judgment must be modified to strike the two prior narcotics conviction enhancements the trial court improperly "stayed" pursuant to section 1385. The Attorney General agrees. We concur. "Ordinarily, an enhancement must be either imposed or stricken 'in furtherance of justice' under . . . section 1385. [Citations.] The trial court has no authority to stay an enhancement, rather than strike it—not, at least, when the only basis for doing either is its own discretionary sense of justice. [Citations.]" (*People v. Lopez* (2004) 119 Cal.App.4th 355, 364.) Here, in staying two of defendant's prior narcotics conviction enhancements, the trial court stated: "In addition, allegations made pursuant to [Health and Safety Code section] 11370.2 of prior convictions, . . . two of the prior convictions are from case 997452MC, committed in June of 1996 in Contra Costa County. Because of the remoteness of those and the age, those are being stayed pursuant to [section] 1385." We conclude the trial court simply misspoke when it said "stayed" rather than "stricken." The judgment is modified to strike these enhancements.

## DISPOSITION

The judgment entered in case No. SF10-027 is affirmed. The judgment entered in case No. SF10-165 is modified as follows: (1) sentence imposed for transportation of methamphetamine is stayed pursuant to Penal Code section 654; and (2) two Health and Safety Code section 11370.2 enhancements are stricken pursuant to Penal Code section 1385. As modified, the judgment is affirmed. The trial court is directed to

17

prepare an amended abstract of judgment to reflect these modifications and to send a certified copy to the Department of Corrections and Rehabilitation.

      HOCH     , J.

We concur:

      ROBIE     , Acting P. J.

      BUTZ     , J.